**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Freddie HUBBARD, Defendant–
Appellant.**

No. 93–2883.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1994.

Decided July 21, 1995.

Rehearing Denied August 24, 1995.

Barry Rand Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, Paul R.Q. Wolfson (argued), Dept. of Justice Civ. Div., Appellate Section, Washington, DC, James B. Burns, Office of the U.S. Atty., Chicago, IL, for plaintiff-appellee.

R. Eugene Pincham (argued), Chicago, IL, Harvey B. Bass, Chicago, IL, for defendant-appellant.

Before FLAUM, EASTERBROOK, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

Samuel Gibson was arrested after delivering a kilogram of cocaine to an undercover police officer. Gibson agreed to cooperate with the authorities and to expose his supplier, Freddie Hubbard. Eventually, Hubbard was arrested and charged with distributing cocaine and conspiring to do so, as well as with the unlawful possession of a firearm by a felon. A jury convicted Hubbard of the firearm charge but could not render a verdict as to the narcotics charges. A second jury convicted Hubbard on the conspiracy charge, and the distribution charge was dismissed. Hubbard appeals, raising a number of issues that we take up seriatim after a summary of the evidence presented below.

## I.

Gibson was, of course, central to the government's case against Hubbard. Gibson and Hubbard had been friends since they played basketball together on the same high school team. By 1990, according to Gibson, they had also become associates in the narcotics trade. In early December of that year, after being contacted by a Columbian cocaine supplier, Gibson telephoned Hubbard to ask if he was interested in purchasing cocaine. Hubbard was, and he agreed to pay $29,000 in exchange for one kilogram. By Gibson's account, he and the supplier (George Marin) subsequently met Hubbard in a Toys–R–Us parking lot on Chicago's south side. The two entered Hubbard's Cadillac and showed Hubbard the cocaine. Hubbard then directed Marin to retrieve the money from a hidden compartment in the rear of the car and to leave the cocaine in the same compartment. Two days later, Gibson and Marin delivered a second kilogram to Hubbard in the same fashion and in the same location.

In May of the following year, Gibson sought to purchase a kilogram of cocaine from Hubbard for re-sale to two of his own customers, Robert Warren and Mark Henry. Unbeknownst to both Gibson and Hubbard, Henry was a special agent with the Illinois

state police and Robert Warren (one of Hubbard's business partners) was cooperating with the FBI. According to Gibson, Hubbard agreed to sell him the cocaine for $23,000. Gibson had sold cocaine to Warren and Henry on three prior occasions beginning in August of 1990, but this was the first time he obtained the cocaine from Hubbard. On May 15, 1991, Gibson paged Hubbard and arranged to complete the exchange on the following day in the same Toys–R–Us parking lot.

Gibson left his home the following morning (unaware that he had a surveillance team in tow) and eventually stopped at a currency exchange to purchase money orders. While there, he was paged by Hubbard. Gibson left the exchange and proceeded to the Toys–R–Us parking lot. There he returned Hubbard's page and informed him he was waiting at the lot. Hubbard arrived moments later in a black Ford Bronco, which he parked behind Gibson's car. FBI Agent James Brown, a surveillance photographer, saw Gibson leave his car and get into Hubbard's Bronco. Hubbard then drove the Bronco to another area of the parking lot and stopped for about 15 to 20 seconds. Photos that Brown took while the Bronco was stopped showed Gibson leaning into the rear of the Bronco. Gibson testified that Hubbard had hit a button on the dashboard of the car which opened a compartment hidden behind a speaker in the back of the Bronco on the driver's side. Gibson had retrieved the cocaine from that compartment and put it into a bag he had brought with him. Hubbard then drove Gibson back to his own car. Gibson assured him that he would have the money for the cocaine in two or three hours. Brown witnessed Gibson leave the vehicle with a black bag that appeared to have something stuffed into it. Gibson entered his own car and left the lot. Subsequently, Brown noticed Hubbard exit the Bronco, walk to the rear, and meet with an individual Brown had seen watching the vehicle earlier.

Gibson proceeded to a restaurant parking lot to meet Henry and Warren. When he displayed the cocaine, he was arrested and questioned. (The cocaine was later determined to be 88 percent pure.) Gibson quickly agreed to lend his assistance in the investigation of Hubbard. Later in the day he paged Hubbard, leaving him an FBI telephone number. When Hubbard called back, Gibson said that his wife had been involved in an automobile accident and that consequently he had been unable to complete the transaction. Hubbard agreed to give Gibson a couple of days "[t]o get his money." Tr. II 67.[1] The conversation was recorded.

On May 18, Gibson was wired with a body recorder and transmitter in anticipation of meeting with Hubbard to pay for the cocaine. Gibson contacted Hubbard by page and, in another recorded conversation, told him that he had the money. The two agreed to meet at "the Cottage," which meant the gasoline station that Hubbard operated at 87th Place and Cottage Grove Road. Gibson was then given $23,000 in "serialized" bills,[2] which he carried in a Dunkin' Donuts bag. Agents followed him to the service station, where Gibson met Hubbard in his office. Gibson testified that he put the $23,000 on Hubbard's desk, an action that the surveillance agents could not confirm as they could not see into the office. Gibson also told Hubbard that "I need one Monday and maybe another one Tuesday," meaning he required another two kilograms of cocaine. Tr. II 80. Hubbard agreed to sell him the additional two kilograms at $23,000 apiece. He told Gibson: "Beep me and we will do it at the same place." Tr. II 81. Apparently, however, Gibson did not follow up, and he made no further purchases from Hubbard.

Hubbard was arrested in October 1992. (The record does not reveal the reason for the delay.) DEA Special Agent Timothy McCormick searched Hubbard's Bronco at that time and discovered the compartment that Gibson had described. The compart-

---

1. The transcript of the second trial on the narcotics charges alone is cited as "Tr. II —." The transcript of the first trial, at which Hubbard was convicted on the firearms charge, is cited as "Tr. I —."

2. The denominations, serial numbers, and series years of the bills were recorded so that in the event the money was later recovered, it could be traced to Hubbard. Apparently, however, none of the cash was ever recovered by the authorities.

ment was opened by depressing a red button on the dashboard while the interior lights and rear window defogger of the vehicle were turned on. In the compartment McCormick discovered two fully loaded 45–caliber firearms and a brown paper bag containing $3,000 in currency. Three pagers were found elsewhere in the vehicle. In a subsequent inspection of the vehicle, a narcotics detection dog alerted to the scent of narcotics on the speaker cover that camouflaged the hidden compartment.

At trial, Hubbard attempted to demonstrate that he was a legitimate businessman who, thanks to Gibson's deception, had been mistaken by the authorities for a drug dealer. Toward that end, Hubbard called a series of witnesses whose testimony indicated that the nature of Hubbard's gasoline service stations required him to take in and deliver large amounts of cash.

William McEnery was president of Gas City, Ltd., the company that owned the three Chicago stations that Hubbard operated. McEnery testified that these stations operated on a cash-only basis in May of 1991, when the relevant transaction between Hubbard and Gibson purportedly took place. The stations took in between $15,000 and $30,000 per day (occasionally up to $40,000); and every day either Hubbard or, more frequently, one of his employees would deliver the cash taken in for gasoline sales during the previous twenty-four hours to Gas City's office in Frankfort, Illinois. (Hubbard kept the receipts for the grocery "mini-marts" located on the premises of the stations.) McEnery suggested that the stations were located in high-crime areas of the city and recalled that until Hubbard assumed operation of the stations, Gas City's drivers had encountered threats when they delivered gasoline to the stations.

Muhammed Judeh, a wholesale grocer, sold up to $15,000 in cigarettes, tobacco, groceries, and other merchandise to Hubbard each week (more than $700,000 annually) for resale in the mini-marts at the stations he operated. About three times weekly, Hubbard or an employee would pick up the goods from Judeh in what Judeh recalled as a black, four-wheel drive vehicle. A day after each pickup, Hubbard would call Judeh to confirm the bill; later he would deliver the cash to Judeh himself. Typically the money was wrapped in a brown paper bag.

A number of individuals were aware of the secret compartment contained in the rear of Hubbard's Bronco. Willie McCaney, an auto mechanic and Hubbard's friend, said that it was his idea to create the compartment as a safe place for the money when Hubbard was transporting it from his stations. He explained that he created the compartment behind a speaker in the rear of the Bronco on the driver's side and installed a safe deposit box inside. Vancie Hubbard Catchiens, Hubbard's sister, worked part-time at the Cottage Grove station. She confirmed that Hubbard's cash receipts had to be transported to Frankfort in order to pay Gas City for the gas he pumped. She was also aware of the hidden compartment in Hubbard's Bronco and said she used it herself in transporting cash deposits to the bank for him. She also knew that Hubbard carried a beeper, but contended that he used this in the conduct of his business as a service station operator. Curtis Robertson, who had done remodeling work on a number of the rental properties that Hubbard owned and on one of the gasoline stations, often delivered Hubbard's daily gasoline receipts to Gas City's Frankfort office, occasionally in Hubbard's company. Robertson confirmed that Hubbard had him put the money in the secret compartment for safe keeping, typically in a brown paper bag. His testimony also suggested that Gibson might have discovered the compartment when he accompanied Hubbard on an errand in January or February 1991 to deliver $1,000 for a dumpster that Hubbard needed.

Two of Hubbard's other friends offered explanations for the guns found in his Bronco. Harold Harvey said that the Sig Sauer automatic was his and that he loaned it to Hubbard on occasion for target practice at a local gun dealer. He acknowledged, however, that Hubbard had kept the gun "for some time" prior to his arrest. Tr. I 1567. Robert Florida, another target practice companion, claimed ownership of the other gun found in the vehicle. Like Harvey, however,

1267

Florida conceded that he had left the gun with Hubbard in either December of 1990 or the Spring of 1991.

Beyond proffering an innocent explanation for his possession of large amounts of cash, the secret compartment in the Bronco, and the two guns, Hubbard also sought to discredit certain points testified to by the surveillance agents who had tracked Gibson's meetings with Hubbard. For example, Chicago police officer James Jackson, who was among the surveillance agents who followed Gibson to the Cottage Grove gasoline station on May 18, had testified that he pumped his own gas after entering the mini-mart to visually confirm Gibson's meeting with Hubbard. However, Charlotte Wanatowicz, an employee of the City Clerk's office, testified that the Cottage Grove station was licensed only as a full-service station during 1991. McEnery confirmed that the station's pumps remained full-service as long as Hubbard operated the stations. He did concede, however, that nothing about the pumps would prevent a customer from pumping his or her own gas. Thomas Varga, a Gas City pump repairman, also thought that the station remained full-service throughout 1991; yet he too agreed that it was possible for customers to pump their own gas. He also acknowledged that he had been called to the station to repair damage occasioned by a customer driving off with a pump nozzle still in the gasoline tank, something he agreed was more likely to occur when customers pumped their own gas. Other witnesses who had occasion to be present or to observe the station more frequently also insisted that the station did not become self-serve until after May of 1991. These included Curtis Robertson, Vancie Catchiens, Lou Pillar, who lived in the area, and Roosevelt Watson, an attendant at the Cottage Grove station.

Pillar called into question another aspect of the surveillance agents' testimony as well. Pillar, who lived four blocks away from the Cottage Grove station, testified that 87th Place, on which the station was located, was a one-way street permitting westbound traffic only. Yet Officer Jackson had testified that he had driven eastbound on 87th Place on his way to the station to observe the meeting between Hubbard and Gibson. Despite Pillar's testimony, however, Sergeant James Linzy of the Chicago Police confirmed that he had seen Jackson drive eastbound on 87th Place, pull into the Cottage Grove station, and pump his own gas. Linzy observed no attendants on the premises during his surveillance.

On another point, Hubbard called to the stand Leon Dorn, a traffic engineer with the City of Chicago. FBI Agent George Randolph had testified that on May 16 (the day Gibson obtained the cocaine from Hubbard), fellow agents apprised him that Gibson had exited the northbound Dan Ryan Expressway at 63rd Street. Randolph had then intercepted Gibson and followed him to the currency exchange where Gibson would receive Hubbard's page. But Dorn testified that there was no exit from the Dan Ryan Expressway for northbound traffic at 63rd Street. Dorn also corroborated Pillar's testimony that 87th Place was a one-way westbound street.

Finally, Emmett Petty, Hubbard's accountant, testified as to Hubbard's finances. Petty had prepared Hubbard's corporate income tax returns, and he confirmed that Hubbard took in large sums of cash from the service stations he operated—in excess of $2 million in 1989 and 1990 and around $1.6 million in 1991. He also noted that Hubbard owned several residential rental properties. According to Petty, Hubbard disclosed all of his income to the IRS and paid all taxes due on that income. An IRS employee verified that Hubbard had filed income tax returns for the years 1989-91.

Hubbard was tried on all three charges in January and February 1993. Although he was convicted on the firearms charge, the jury deadlocked on the two narcotics charges. After the district court declared a mistrial on the narcotics counts, Hubbard was retried in April 1993. The second jury found him guilty on the conspiracy charge, but deadlocked on the distribution charge. A mistrial was declared on that remaining count and it was dismissed on the government's motion. The district court sentenced Hubbard in July of 1993 to concurrent prison terms of 160 months on Count I (the conspir-

acy charge) and 130 months on Count III (the firearms charge) and fined Hubbard $175,000. The court also ordered Hubbard to forfeit an additional $23,000 (the "buy money" with which Gibson had paid for the kilogram of cocaine) as well as his Bronco.

## II.

### A. Comment on Hubbard's Failure to Testify

■ Hubbard did not testify at either of his two trials. At his second trial, one of the prosecutors referred to Hubbard's ability to testify on a particular point, if he wished, in a manner that Hubbard contends impinged on his Fifth Amendment right. The remark came during the testimony of McEnery, when Eugene Pincham, Hubbard's counsel, attempted to elicit from the witness why Hubbard had turned down an opportunity to purchase from Gas City the three service stations that he operated.

> A. [BY MR. McENERY]: We offered the stations to Freddie right before we sold them to this fella who has got them now. We thought Freddie deserved the right of first refusal because he has been there and we offered them, but he turned them down because he said he couldn't make any money.
>
> Q. [BY MR. PINCHAM]: He turned them down. Did he tell you at the time he turned them down that—
>
> MR. SCHNEIDER: (ASSISTANT U.S. ATTORNEY) Objection to what Hubbard told this gentleman.
>
> MR. PINCHAM: I will withdraw it.
>
> MR. SCHNEIDER: That is hearsay.
>
> THE COURT: Yes, sustained.
>
> MR. PINCHAM: It is not hearsay.
>
> MR. SCHNEIDER: Let Hubbard tell us.
>
> MR. PINCHAM: No, it is not hearsay. It is not hearsay. Judge, may I be heard at sidebar?

Tr. II 1282. At the ensuing sidebar, the defense moved for a mistrial, which the district court denied. The defense also rejected the court's offer to strike the prosecutor's remark. Hubbard's contention then and now is that the comment "Let Hubbard tell us"

quickly and irrevocably highlighted that Hubbard could testify but had decided not to do so and, inevitably, invited the jury to draw an adverse inference from the exercise of Hubbard's right not to take the witness stand.

■ We are not persuaded, however, that the prosecutor's remark, even if intentional, infringed on Hubbard's Fifth Amendment right. Remarks of this nature must, of course, be evaluated in context. *United States v. Goodapple,* 958 F.2d 1402, 1405 (7th Cir.1992). Here, the government's reference to Hubbard testifying occurred in the context of a discussion concerning an evidentiary objection (whether McEnery could recount what Hubbard said about his decision not to exercise the purchase option). Thus, although made in the jurors' presence, the remark was not addressed to them directly in the same way it might have been in closing argument, suggesting the way in which they should view the evidence. *Cf. id.* (although including defendant's name on list of potential witnesses that was read to jury was subject to misinterpretation, it "does not appear intended to be a remark on the accused's failure to testify or the defendant's right to remain silent"). At the same time, the context of the remark arguably lends at least a modicum of plausibility to the government's explanation that the remark was merely a shorthand way of suggesting that only Hubbard's testimony could circumvent the hearsay problem. Yet, even if it was, in effect, an invitation for Hubbard to testify spoken for the jury's benefit, it was no more than that. Although the government might possibly have drawn the jury's attention to Hubbard's decision not to testify, it did not in any way suggest that the jury should draw an adverse inference from Hubbard's silence. As we observed in *United States v. Sblendorio,* "[U]nless the prosecutor's comment uses the defendant's privilege as evidence against him, it is not objectionable. A court may even call the jury's attention to the defendant's failure to testify, so long as it does not invite an inference based on the privilege." 830 F.2d 1382, 1391 (7th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988) (citing *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55

L.Ed.2d 319 (1978)).[3] In short, any impact that the remark might have had on the jury was surely harmless, particularly given the court's standard instruction at the close of trial admonishing the jury to give no weight to the defendant's decision not to testify. Tr. II 2088.

## B. The Weapons Charge and Instruction

■■■ In relevant part, 18 U.S.C. § 922(g) provides that "[i]t shall be unlawful for any person—(1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition...." Hubbard contends principally that the indictment against him did not state an offense under section 922(g)(1) because it alleged that he knowingly possessed firearms "which had been *transported* in interstate commerce" rather than possessing them "in or affecting" interstate commerce. For the same reason, he challenges the pertinent instruction advising the jury that the "in or affecting commerce" element of the offense is satisfied by proof that "the firearm traveled at some time in interstate commerce." Tr. I 1950.[4]

These arguments are foreclosed by our opinion in *United States v. Lowe*, 860 F.2d 1370, 1373–74 (7th Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). The Supreme Court, as we noted in *Lowe*, has concluded that the use of the words "in or affecting commerce" found in section 922(g) evince the intent of Congress "to reach the possession of firearms broadly," requiring no more than " 'the minimal nexus that the firearm have been, at some time, in interstate commerce.'" *Id.* at 1374 (quoting *Scarborough v. United States*, 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977)).[5] With that in mind, we found an indictment charging that the defendant, hav-

ing previously been convicted of a felony, possessed a firearm "which had previously traveled in interstate commerce" sufficient to state an offense under section 922(g). *Id.* at 1373–74; *see also United States v. Buggs*, 904 F.2d 1070, 1076 (7th Cir.1990); *United States v. McCarty*, 862 F.2d 143, 145–46 (7th Cir.1988). We emphasized that so long as the defendant is adequately apprised of the nature of the charge against him and the essential elements of the charged offense, the indictment need not track the language of the statute precisely or employ any particular language. 860 F.2d at 1373; *accord United States v. Quintanilla*, 2 F.3d 1469, 1477 (7th Cir.1993). The indictment's reference to the weapon's prior transport in interstate commerce was, we decided, an adequate means of alleging the "in or affecting commerce" element of the offense. 860 F.2d at 1373–74; *accord United States v. Gillies*, 851 F.2d 492, 493–95, 496 (1st Cir.) (Breyer, J.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). The wording of the indictment in *Lowe* is indistinguishable from the language of the indictment here, and Hubbard offers us no reason to overrule *Lowe*. Accordingly, we find no defect in the indictment and no error in the corresponding jury instruction.

## C. Joinder and Severance

■■■ Hubbard contends that the firearm possession charge (Count III) was improperly joined with the narcotics conspiracy and possession charges (Counts I and II) and that he was prejudiced by the district court's refusal to grant his request for a severance. Of course, Hubbard ultimately received a separate trial on the two narcotics charges, which resulted in his conviction on Count I. Consequently, he can claim no prejudice as to that conviction resulting from any error in the joinder of the original charges. His ar-

---

3. The government suggests that, at most, it merely returned the jury's attention to a subject that had already been raised in voir dire, when Hubbard's counsel purportedly explored the questions that naturally arise in a juror's mind when a defendant decides not to testify. Gov.Br. at 22 (citing Tr. April 6, 1993 at 67). Unfortunately, the relevant volume of the transcript has not been included in the record on appeal, so we do not rely on this representation.

4. Hubbard contends briefly that the indictment lacks sufficient detail in other respects, but we find no merit in his argument.

5. *Scarborough* construed the statutory forerunner to section 922(g), 18 U.S.C.App. § 1202(a), which employed the same "in or affecting commerce" language as the current statute.

gument is necessarily limited at this juncture to the proposition that being tried simultaneously on all three charges in the first instance tainted his conviction on Count III.

■ Initially, we must consider whether the joinder of the weapons and narcotics charges in a single indictment was proper. *United States v. Windom,* 19 F.3d 1190, 1196 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994) (citing *United States v. Donaldson,* 978 F.2d 381, 391 (7th Cir.1992)). Rule 8(a) of the Federal Rules of Criminal Procedure provides that separate offenses may be charged in the same indictment if those offenses "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether this is true of the offenses with which Hubbard was charged is a question of law that we review *de novo. United States v. Coleman,* 22 F.3d 126, 134 (7th Cir.1994); *Windom,* 19 F.3d at 1196.

■ The government argues that the narcotics charges were properly joined with the weapons charge because they were either "connected together" or of a "similar character." In the government's view, "[t]he firearms count arose out of Hubbard's trafficking in narcotics, and the narcotics counts explained the motive for the possession of the firearms." Gov.Br. at 26. The government also reminds us that firearms are recognized as tools of the drug trade; thus, courts have sustained the admission of weapons evidence in narcotics cases because the possession of a weapon is often a hallmark of drug trafficking. *E.g., United States v. Ramirez,* 45 F.3d 1096, 1103 (7th Cir.1995) (collecting cases). Finally, the government points out that the presence of guns in the Bronco's secret compartment tended to rebut Hubbard's claim that the compartment was used solely to carry the cash taken in by his gasoline stations; thus, there was an evidentiary overlap between the charges, in the sense that the evidence necessary to establish the firearms offense was also admissible to rebut the defense on the narcotics charges. We find none of these arguments

persuasive, and conclude that the charges were misjoined in this case.

The firearms were discovered in Hubbard's Bronco more than seventeen months after the May 1991 narcotics transaction between Gibson and Hubbard. In other cases, where firearms have been discovered along with evidence of a defendant's drug trafficking, joinder of firearms and weapons charges has been approved due to the natural inferences that may be drawn from the contemporaneous possession of guns and drugs or drug paraphernalia: the firearm is an indication of drug activity, and participation in drug trafficking supplies a motive for having the gun. *See, e.g., United States v. Terry,* 911 F.2d 272, 276–77 n. 2 (9th Cir.1990) (collecting cases); *United States v. Jones,* 880 F.2d 55, 62 (8th Cir.1989); *United States v. Gorecki,* 813 F.2d 40, 42 (3d Cir.1987); *United States v. Sanko,* 787 F.2d 1249, 1251 (8th Cir.1986); *see also United States v. Cox,* 934 F.2d 1114, 1119 (10th Cir.1991); *United States v. Valentine,* 706 F.2d 282, 289 (10th Cir.1983). Here, however, a significant expanse of time separates the discovery of the firearms from the conduct underlying the narcotics charges. The fact that Hubbard carried guns in his Bronco in October of 1992 tells us little about his distribution of narcotics nearly a year and a half earlier, and vice versa. *See United States v. Betts,* 16 F.3d 748, 758 (7th Cir.1993); *United States v. Zelinka,* 862 F.2d 92, 99 (6th Cir.1988); *see also Gorecki,* 813 F.2d at 42 (acknowledging possibility that joinder of weapons and narcotics charges might be inappropriate where they are not sufficiently connected temporally or logically).

The indictment itself offers nothing more from which one might permissibly infer a connection between the two criminal acts— and it is the face of the indictment on which we must focus in deciding whether the charges were properly joined. *See Coleman,* 22 F.3d at 134; *United States v. Velasquez,* 772 F.2d 1348, 1354 (7th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). The unlawful possession of a firearm is, of course, an offense wholly distinct from the distribution of narcotics, established on proof of elements unique to

that offense. It is not, in other words, a crime "of the same or similar character" to narcotics trafficking for purposes of Rule 8(a). *See generally Windom,* 19 F.3d at 1196. True, the two do often occur hand in hand, and in that sense they might be deemed "connected together" or "parts of a common scheme or plan" given a temporal nexus between them. *E.g., Cox,* 934 F.2d at 1119; *Valentine,* 706 F.2d at 289. But when nearly a year and a half transpires between the distribution of narcotics and the possession of a firearm, something more must tie the two offenses together to permit joinder in a single indictment. *See Zelinka,* 862 F.2d at 99.

The government places a great deal of emphasis on the fact that the firearms were discovered in the same compartment from which Gibson retrieved the cocaine in May of 1991. That circumstance certainly suggests that Hubbard used the compartment to hide more than one kind of contraband over time; and, as the government suggests, it arguably rebuts Hubbard's claim at trial that he used the compartment solely for the legitimate purpose of transporting the daily cash receipts from his gasoline stations, *cf. Ramirez,* 45 F.3d at 1102 (evidence concerning marijuana found in defendant's apartment admissible in trial for conspiracy to distribute cocaine to rebut contention that he was an innocent bystander rather than a member of the conspiracy). But without something else, it links the two charges for purposes of Rule 8(a) no more closely than *any* two crimes committed in the same residence or the same vehicle. Similarly, the fact that a trained police dog alerted to the scent of narcotics in the compartment when the firearms were found might support the inference that Hubbard was (again) engaged in narcotics activity in or around October of 1992.[6] Even so, it does not establish a nexus with the transaction between Gibson and Hubbard in 1991.

The common factor among the firearms and narcotics charges—use of the same se-

cret compartment in the jeep—does, as the government notes, signal some evidentiary overlap that might render a joint trial more efficient.[7] *See generally United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (citing the prudent use of prosecutorial and judicial resources as among the reasons supporting joinder); *United States v. Woody,* 55 F.3d 1257, 1267 (7th Cir.1995); *Coleman,* 22 F.3d at 132; *United States v. Koen,* 982 F.2d 1101, 1111–12 (7th Cir.1992). But this is an argument of hindsight; it is not a point that is at all evident from the face of the indictment or from the nature of the offenses charged. *See Coleman,* 22 F.3d at 134; *Terry,* 911 F.2d at 276. In any case, the overlap is extremely slight: the government has merely suggested that Agent McCormick would have had to testify twice concerning the firearms found in the compartment had the counts been severed at the outset. (Of course, he testified twice in any event, given the mistrial.) Given the otherwise disparate nature of the offenses, the rather slight burden imposed by requiring two separate trials in this case would not have been onerous.

With these considerations in mind, we are compelled to conclude that the firearms and narcotics charges in this case were misjoined. We need not consider, therefore, the separate issue of whether the district court abused its discretion in denying Hubbard's Rule 14 motion for a severance. *Velasquez,* 772 F.2d at 1353. The only question relevant at this point is whether the misjoinder was harmless, that is, whether it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Lane,* 474 U.S. at 449, 106 S.Ct. at 732 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)); *see also Koen,* 982 F.2d at 1112. Again, our focus here is solely on the first trial, which yielded a conviction on the firearms charge, given that Hubbard ultimately did receive a separate trial on the

---

6. We note, however, that the government has identified no other evidence that Hubbard was, in fact, continuing to distribute narcotics as of this date.

7. The use of the same compartment arguably might hint of a particular modus operandi, but not one unique enough, in our view, to support the joinder of distinct offenses so separated in time.

narcotics charges after the first jury could not reach a verdict on those counts.

■■■■ We find the misjoinder harmless. We are inclined to agree with Hubbard that had he been tried on the gun charge alone at the initial trial, none of the evidence offered to prove the narcotics charges would have been admissible. Given that the first trial was a joint trial on all three charges, however, the narcotics evidence was, of course, before the jury, raising the possibility that this evidence may have tainted the jury's deliberations as to the firearms charge. We are nonetheless confident that the joint trial had no substantial and injurious impact on the jury's evaluation of the firearms charge. The elements of that charge could not be more straightforward. Once Hubbard's prior felony conviction was established, the prosecution needed only to prove that Hubbard possessed a firearm that had traveled in interstate commerce. The evidence that the guns had previously traveled in interstate commerce was quite clear: Mark Bartholomew, a Special Agent with the Bureau of Alcohol, Tobacco and Firearms, testified that the Sig Sauer P 220 found in Hubbard's Bronco had been manufactured in what was formerly West Germany and imported by Sig Arms of Tyson's Corner, Virginia, while the Detonics pistol also found in the Bronco had been manufactured in Bellevue, Washington. As to the matter of possession, Hubbard did not dispute that the weapons were, in fact, in his Bronco. He argued principally in defense that the guns were not his, but had been loaned to him by acquaintances. *See* Tr. I 29–30, 1557–61, 1573–76, 1856–57. But the fact that Hubbard did not own the guns does not vitiate his possession of them for purposes of section 922(g). *See United States v. Mains*, 33 F.3d 1222, 1228 (10th Cir.1994) ("[s]ection 922(g)(1) requires possession, not ownership of the gun"); *United States v. Boykin*, 986 F.2d 270, 274 (8th Cir.) ("ownership is irrelevant to the issue of pos-

session"), *cert. denied*, —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993); *see also United States v. Wight*, 968 F.2d 1393, 1398 (1st Cir.1992) ("as long as a convicted felon knowingly has the power and the intention at a given time of exercising dominion and control over a firearm or over the area in which the weapon is located, directly or through others, he is in possession of the firearm"). The evidence as to Hubbard's culpability under the statute was, in other words, overwhelming (*see Lane*, 474 U.S. at 450, 106 S.Ct. at 732), and we discern no way in which the narcotics evidence might somehow have led the jury astray in considering this charge. Moreover, the fact that the jury convicted Hubbard on the weapons offense but could not reach a verdict on the two narcotics charges suggests, if anything, that the jury was quite able to separate the firearms count from the narcotics counts and deliberate each with the appropriate evidence and legal criteria in mind.

## D. Evidentiary Issues

■■■■ Hubbard objects to the admission of three types of evidence at his second trial on the narcotics charges.[8] These include (1) the admission of evidence concerning the firearms discovered in the secret compartment of Hubbard's Bronco; (2) the admission of testimony concerning the canine alert to the scent of narcotics in that compartment; and (3) the admission of expert testimony concerning the cocaine trade in Chicago and the employment by narcotics dealers of devices like the compartment in Hubbard's Bronco. The evidentiary rulings of the district court command particular deference on appeal and will be deemed erroneous only upon a showing that the court abused its discretion. *E.g., United States v. Edwards*, 47 F.3d 841, 843 (7th Cir.1995); *United States v. Brown*, 7 F.3d 648, 651 (7th Cir.1993).

---

8. The government's evidence at the two trials was virtually the same, and Hubbard has asserted the same objections with respect to the narcotics evidence admitted at the first trial. We need not address his arguments as they relate to that trial, however. As we have indicated above, although the narcotics-related evidence was not relevant to the firearms charge, the admission of the evidence did not adversely affect the jury's deliberations on that charge. In light of that conclusion, we deem any challenges to the admission of a particular portion of the narcotics-related evidence at the first trial to be immaterial.

### 1. The firearms evidence

At Hubbard's second trial, DEA Special Agent Timothy McCormick testified as he had at the earlier trial that he discovered two firearms in the secret compartment of Hubbard's Bronco when he searched the vehicle in October 1992. Hubbard contends that the admission of this testimony was improper vis à vis the narcotics charges. The government, as we have noted above, contends that the discovery of the firearms was relevant to rebut Hubbard's contention that he used the compartment solely for the legitimate purpose of carrying the cash receipts from his service stations. *See supra* at 1270–71. We need not reach the merits of this issue, however. Although in his opening brief Hubbard has recounted the defense testimony explaining the presence of the firearms in Hubbard's vehicle (Opening Br. at 40), he has made no effort to articulate why the admission of McCormick's testimony was improper. His reply brief does no more than mention the contention in passing (Reply Br. at 9), despite the government's having flagged the potential waiver in its own brief (Response Br. at 34–35). Under these circumstances, we deem any argument on this subject to have been waived. *E.g., Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995); *United States v. South*, 28 F.3d 619, 629 (7th Cir.1994).[9]

### 2. Canine alert to scent of narcotics

Chicago Police Officer Mark Ganier testified at trial that on October 27, 1992 (five days after Hubbard's Bronco was sized), a narcotics detection dog named "Hawk" alerted to the scent of narcotics on the speaker cover camouflaging the secret compartment in Hubbard's Bronco. Ganier conceded that Hawk could not distinguish among the scents of the four narcotics he was trained to detect: cocaine, marijuana, heroin, and hashish. Tr. II 1247–48. He also acknowledged on cross-examination that cash could take on the scent of narcotics when handled by someone who has recently been in contact with narcotics.

Tr. II 1249. He agreed that such cash, if it were subsequently accepted by a businessperson in payment for gasoline or groceries and placed in a compartment like the one in Hubbard's Bronco, might leave the scent of narcotics in the compartment. Tr. II 1249–51. Indeed, Hawk had also alerted to the scent of narcotics on the $3,800 that was found in the compartment along with the two firearms. Hubbard contends that the admission of Hawk's alert to the scent of narcotics in the compartment and on the cash was improper, both because Hubbard was charged with narcotics trafficking in May of 1991 rather than October of 1992 and because the jury could only speculate as to the source and significance of the narcotic scent.

We agree that the canine alert to the possible presence of narcotics in Hubbard's vehicle was presumptively inadmissible to show that Hubbard had trafficked in cocaine more than seventeen months earlier. The indictment did not charge Hubbard with any narcotics dealing other than the single transaction with Gibson in May 1991, and no evidence was presented at trial suggesting that this transaction was merely one incident in a pattern of trafficking that continued through October of 1992 when Hubbard was arrested. Thus, even if we assume that the dog's detection of the scent of narcotics signaled recent narcotics dealing by Hubbard (more on that below), it would shed little or no light on whether Hubbard had in fact distributed cocaine to Gibson well over a year before. *See Betts*, 16 F.3d at 758–761.

But the government does not justify the admission of this evidence on the ground that it was directly probative of whether Hubbard had sold cocaine to Gibson in 1991. Instead, the government reasons that it was admissible to rebut Hubbard's contention that he used the compartment solely to carry the daily cash intake from his stations and not to carry contraband. As the government points out, Hubbard put the purpose of the Bronco's secret compartment into issue from the beginning of the first trial. During opening statements, Hubbard's counsel predicted that the evidence would show Hubbard used the

---

9. Hubbard has separately argued that the admission of the firearms evidence at the second trial violated his right not to be subjected to double jeopardy. We take that argument up below.

compartment solely to carry cash for business purposes. Tr. I 27–28. This was a theme that continued into the second trial. *See, e.g.*, Tr. II 1200–02, 1248–51. Given this position, we believe it was within the district court's discretion to allow evidence showing that Hubbard used the compartment to carry items other than cash, including narcotics. Thus, to the extent that Hawk's alert suggested that narcotics had been stored in the compartment, we find no error in the admission of Ganier's testimony.

We also agree that the reaction of the police dog, although subject to different interpretations, was sufficiently probative of the presence of narcotics to be admissible under Rules 401, 402, and 403. Hubbard's counsel quite ably established that there were explanations for the scent of narcotics in the compartment other than Hubbard having put narcotics there. It may be, as Ganier himself acknowledged, that the scent was left by cash that Hubbard had innocently accepted from a service station customer who had handled narcotics. *See United States v. U.S. Currency, $30,060.00,* 39 F.3d 1039, 1041–43 (9th Cir.1994) (noting high rate of narcotics-contaminated cash in urban money supplies). But the possibility that the scent of narcotics may have an innocent explanation does not render the evidence inadmissible. The fact that a trained police dog detected the scent of narcotics in Hubbard's Bronco makes the possibility that he carried narcotics in the compartment (and thus, contrary to his defense, did not use it exclusively for legitimate purposes) more likely than it would seem without this evidence, which is all that Rule 401 requires to make the evidence relevant. The jury heard the contrary interpretations suggested by the parties, and it was for the jury to decide what weight to give the evidence. We discern no inherent flaws or undue prejudice in the evidence that precluded its admission. The district court did not abuse its discretion in allowing it.

3. Expert testimony regarding the cocaine trade

■ Frank Tucci, a DEA agent with over twenty-one years of experience, was permitted to testify as an expert concerning the cocaine trade. Although Tucci had played no role in the investigation of this case, his testimony touched on a number of the key elements in the government's case against Hubbard. Tucci testified as follows:

(1) At the wholesale level, cocaine is typically distributed in quantities of one kilogram with a purity of approximately 85 percent or greater. In May 1991, the wholesale price of a kilogram of cocaine with a purity of 88 percent would have been between $19,000 and $26,000.

(2) Narcotics are typically sold at the wholesale level either for cash at the time of sale or on consignment, with the expectation that the buyer will promptly re-sell the cocaine and pay the wholesaler from the proceeds.

(3) Cash is the most common form of payment for narcotics because it is difficult to trace.

(4) Narcotics dealers tend to use mobile telephones, pay phones, and pagers (possibly more than one) to conduct their illicit business in order to evade electronic monitoring.

(5) Dealers speak in code when discussing their transactions.

(6) Dealers often transport narcotics in hidden compartments within their automobiles so as to avoid police detection in the event of a stop.

(7) Dealers typically carry firearms (sometimes more than one) for protection.

(8) Dealers typically attempt to maintain a low profile in the community so as to avoid the attention of authorities.

Tr. II 1178–88. Hubbard contends that Tucci was permitted to offer an opinion on each of the controverted factual issues in the government's case, casting an incriminatory spin on each circumstance that Hubbard contended had an innocent explanation and thus, for all practical purposes, rendering an opinion on Hubbard's culpability.

■ We find no abuse of discretion in the admission of Tucci's testimony. Fed.R.Evid. 702 permits expert testimony when the specialized knowledge of the witness will aid the factfinder in understanding the evidence or

determining a fact in issue. The admission of testimony pursuant to Rule 702 will be reversed only on a showing of " 'a clear abuse of discretion.' " *United States v. Brown, supra,* 7 F.3d at 651 (quoting *United States v. Amaechi,* 991 F.2d 374, 377 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993)). Hubbard does not suggest that Tucci lacked the knowledge and expertise required to testify as an expert on the cocaine trade. He does suggest, in passing, that much of what Tucci testified to is common knowledge. But "[b]ecause courts have recognized that the average juror is unlikely to be knowledgeable about drug trafficking, they consistently have allowed expert testimony concerning the 'tools of the trade' and the methods of operation of those who distribute various types of illegal narcotics." *Id.* at 652 (collecting cases). As we understand it, Hubbard's argument is confined to the notion that Tucci, in voicing inculpatory inferences from the circumstantial aspects of the government's case against Hubbard (that a secret compartment in an automobile is a hallmark of narcotics dealing, for example), in effect opined that Hubbard must have knowingly and intentionally distributed cocaine and/or conspired to do so, in violation of Rule 704(b)'s proscription against opinion testimony on the ultimate issue of the defendant's mental state. *See id.* at 651. In fact, however, Tucci never came close to offering such an opinion. Indeed, Tucci did not speak to Hubbard's conduct at all. He spoke merely in general terms, and although the government unquestionably used Tucci's testimony to argue that Hubbard's conduct was indicative of drug dealing, Tucci himself never offered that opinion. *See United States v. Lipscomb,* 14 F.3d 1236, 1239 (7th Cir.1994); *United States v. Foster,* 939 F.2d 445, 454 (7th Cir.1991). Moreover, nothing in Tucci's testimony foreclosed or hampered the defense in offering innocent explanations for evidence that Tucci had identified as consistent with narcotics trafficking. *See Brown,* 7 F.3d at 653; *Foster,* 939 F.2d at 452 (it is fair use of expert testimony to offer incriminatory explanation for behavior that may otherwise appear innocent). Finally, we note that the district court admonished the jury: "[T]he fact that an expert has given an opinion does not mean that it is binding upon you or that you are obligated to accept the expert's opinion as to the facts. You should assess the weight to be given to the expert opinion in the light of all of the evidence in this case." Tr. II 2087–88. *See Foster,* 939 F.2d at 453. Tucci's limited testimony therefore was not unduly prejudicial.

### E. Double Jeopardy

■ At Hubbard's second trial on the narcotics charges, the government was permitted to offer evidence concerning the firearms found in his Bronco. Hubbard argues that the introduction of this evidence forced him once again to respond to the firearms charge and thereby violated his Double Jeopardy rights, given that he had already been convicted on that charge at the first trial. Yet Hubbard was neither charged with nor tried for a weapons offense at his second trial. Instead, the government offered the evidence concerning the firearms for the same reason it offered the evidence of the canine's alert to the scent of narcotics—to rebut Hubbard's contention that the hidden compartment in the Bronco was used solely for legal purposes. As the Supreme Court has noted, "the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct." *United States v. Felix,* 503 U.S. 378, 387, 112 S.Ct. 1377, 1383, 118 L.Ed.2d 25 (1992). Thus, the fact that Hubbard had already been convicted on the firearms charge did not bar the government from offering the evidence underlying that charge a second time not as proof of Hubbard's criminal liability per se, but in order to debunk the defense contention as to the use of the secret compartment in Hubbard's Bronco. *Id.* & n. 3.

### F. Redaction of Plea Agreement

■ A key witness against Hubbard on the narcotics charges was, of course, Samuel Gibson. Gibson acknowledged on the stand that he had pled guilty to a charge of cocaine distribution and said that he expected to be sentenced to a prison term of approximately 26 months provided he complied with his obligation to assist the government. Tr. II

135–36. Gibson's plea agreement was admitted into evidence and was among the items sent to the jury room. At the government's request, however, paragraph 5 of the agreement, detailing the conduct underlying the narcotics charge to which Gibson had pled guilty, was redacted from the copy of the agreement provided to the jury. Paragraph 5 outlined a conspiracy to distribute cocaine between Gibson and Jorge Enrique Marin (a.k.a. George Marin) that began in July 1990 and continued until May 16, 1991 (when Gibson was arrested). A number of the transactions cited in this paragraph included sales by Gibson and Marin to a confidential informant and undercover agent Mark Henry. As noted earlier, Gibson delivered a kilogram of cocaine to Agent Henry on May 16, 1991 that he purportedly obtained from Hubbard. Despite the photographed meeting between Hubbard and Gibson at the Toys–R–Us parking lot just prior to this delivery (during which, according to Gibson, he took the cocaine from the compartment in Hubbard's Bronco), Hubbard suggests that Gibson actually obtained the cocaine from Marin. But, Hubbard argues, the omission of the paragraph of Gibson's plea agreement detailing Gibson's dealings with Marin and, in particular, their sales to Agent Henry, crippled the defense's ability to establish that possibility.[10]

The decision to redact the plea agreement was one committed to the district court's discretion, *see generally United States v. Schweihs,* 971 F.2d 1302, 1314 (7th Cir.1992), and we find no find no abuse of that discretion in this case. We agree with Hubbard that Gibson's history of narcotics trafficking with Marin was relevant, both in terms of Gibson's credibility as a witness against Hubbard and as a basis for Hubbard's theory that the kilogram of cocaine Gibson delivered to Henry on May 16, 1991 was supplied by Marin, not Hubbard. Yet, as Hubbard's counsel himself pointed out in renewing his objection to redaction of the plea agreement, "[t]here is nothing in paragraph 5 that [the jurors] have not already heard, not one word.

It is already in evidence...." Tr. I 1961. The government had, in fact, elicited from Gibson on direct examination testimony regarding his dealings with Marin and his sales to Agent Henry, and what the government did not establish to the defense's satisfaction, Hubbard's counsel brought out in detail during two days of cross-examination. Thus, by Hubbard's own account, it was established not only that Gibson was a drug dealer, but also that:

Gibson ... had repeatedly lied under oath in his bankruptcy petition and proceedings, that he had illegally concealed a $60,000 [certificate of deposit]; that he had laundered his profits from drug trafficking at a currency exchange at 61st and Vernon in Chicago; that he faked $100,000 in gambling debts; that he concocted evidence; that he wanted to and lied to deceive the judge; that he had his wife lie under oath; that he lied on his 1984, 1985 and 1986 federal and state income tax returns and that, by reason thereof, he had received a $4,700 tax refund; that he had not filed tax returns for 1989 or 1990 or 1991 when he was arrested on March 16, 1991; that he perjured himself on all his tax returns and on his bankruptcy petition, for which no charges had been filed against him, but which was not a part of his plea agreement; that he and his wife lied for each of them to illegally obtain two social security numbers so they could lie to and cheat their creditors; that he and his wife violated the law when they lied to the mortgage company to deceive the mortgage company that was lending the buyer the money to purchase their Olympia Fields home, for which they had not been prosecuted; that he had his wife accompany him on his illegal drug transactions[;] and that he had received around $13,500 from the DEA since he began cooperating after his March 16, 1991 arrest.

Opening Br. at 46 (record citations omit-

10. At the conclusion of the first trial, we should point out, the jury sent a note to the district judge after beginning its deliberations observing that Paragraph 5 appeared to have been deleted. Over Hubbard's objection, the district judge replied with a note confirming that the paragraph had indeed been removed and instructing the jury to continue its deliberations. Tr. I 1960–67. Paragraph 5 was redacted from the plea agreement at the second trial as well.

ted).[11] In short, Hubbard's counsel not only demonstrated through Gibson's testimony that Gibson had sold cocaine obtained from Marin or another supplier (not Hubbard) to Agent Henry and informant Robert Warren on multiple occasions (Tr. II 255–277); he also succeeded in demonstrating that Gibson had repeatedly engaged in unlawful acts of deception in the past when it furthered his own interests—including the fabrication of evidence (Tr. II 106, 108, 110). The redacted paragraph of the plea agreement, although it would have provided a convenient summary of Gibson's dealings with Marin, was merely cumulative of the evidence that the jury had already heard at length. We therefore find no abuse of discretion in the district court's decision to permit the redaction, and certainly no prejudice to Hubbard that flowed from the decision. The jury was not deprived of any information material to an assessment of Gibson's credibility and Hubbard's defense.

### G. Conspiracy: Sufficiency of the Evidence

 The conspiracy charge against Hubbard rests entirely on the May 1991 distribution of a kilogram of cocaine via Gibson to Henry and confidential informant Robert Warren. Hubbard argues that the evidence at most established a buyer-seller arrangement between Hubbard and Gibson and thus failed to establish that Hubbard conspired with Gibson to distribute narcotics. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993); *United States v. Kellum*, 42 F.3d 1087, 1091 (7th Cir.1994). "However, 'if the seller agrees to sell cocaine to the buyer, and the buyer agrees to buy, specifically for the purpose of having that buyer later distribute the cocaine to others … a conspiracy does exist—there is an agreement beyond the mere sale for personal consumption.' " *Id.* (quoting *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir.1994)). Hubbard, of course, bears a heavy burden in challenging the suf-

ficiency of the evidence against him. *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995); *United States v. Hubbard*, 22 F.3d 1410, 1414 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 762, 130 L.Ed.2d 660 (1995). We view the proof, including the inferences that may be drawn from it, favorably to the government and abstain from weighing the evidence or evaluating the credibility of the witnesses. *Kellum*, 42 F.3d at 1090–91. We must uphold the verdict so long as any rational trier of fact could have found that the evidence, so viewed, established the essential elements of the offense beyond a reasonable doubt. *United States v. Woody, supra*, 55 F.3d at 1264; *Zarnes*, 33 F.3d at 1465; *Hubbard*, 22 F.3d at 1415.

 Gibson testified that Hubbard had "fronted" him the kilogram of cocaine on May 16, with the expectation that Gibson would pay him within a few hours. Tr. II 28, 39, 59. Gibson's post-arrest phone call to Hubbard, in which Hubbard consented to a delay in payment because Gibson hadn't yet been able to meet his "guy" (Tr. II 67), tends to establish Hubbard's understanding that Gibson had purchased the cocaine for resale to others and that Hubbard would be compensated from the proceeds. Tucci's testimony confirmed that this was a common method by which cocaine wholesalers were paid. Tr. II 1180. Gibson, we add, was *no stranger* to Hubbard. Hubbard himself had purchased re-sale quantities from Gibson and Marin on two prior occasions (Tr. II 8–19), and when Gibson delivered the $23,000 to Hubbard on May 18, Hubbard readily assented to supplying him with two additional kilograms of cocaine the following week. Tr. II 80–81. Indeed, the testimony indicates that Hubbard and Gibson had developed a rather comfortable routine for their narcotics transactions exemplified by the repeated use of the Toys–R–Us location, the consummation of kilogram-quantity transactions on relatively short notice, and the use of an elaborate

---

11. Hubbard's brief cites to the record of the first trial, but the impeachment of Gibson was no less thorough at the second. *See* Tr. II 105–119, 144–236.

numeric paging system.[12]

One could reasonably infer from the circumstances presented here—the sale of a substantial quantity of cocaine on consignment, a pre-existing and continuing relationship, and a standardized and sophisticated transactional methodology—that Hubbard had a concrete stake in Gibson's distribution of the cocaine and thus agreed to commit a crime beyond the mere sale of the cocaine to Gibson. *See United States v. Rodriguez,* 53 F.3d 1439, 1445 (7th Cir.1995); *United States v. Sax,* 39 F.3d 1380, 1385 (7th Cir.1994); *United States v. Clay,* 37 F.3d 338, 341–42 (7th Cir.1994); *Zarnes,* 33 F.3d at 1465; *United States v. Dortch,* 5 F.3d 1056, 1065–66 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994), and *cert. denied,* —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995). We therefore believe that the evidence was sufficient to support the jury's finding that Hubbard did, in fact, enter into an agreement with Gibson to distribute cocaine.

## H. Motion for New Trial

■ Prior to sentencing, Hubbard sought a new trial on the narcotics charges based on the proffered testimony of Zebedee Love. Love had been one of Gibson's cocaine suppliers (Tr. II 7, 23), and following Gibson's arrest, Gibson helped the government expose Love by purchasing cocaine from him. At the evidentiary hearing conducted by the district court on Hubbard's request for a new trial, Love testified that on three of the four occasions Gibson purchased cocaine from him while cooperating with the government, Gibson had taken a portion of the cocaine for his personal use and that on two occasions, Gibson had "shorted" him on the purchase money (which had been supplied by the government) and kept some for himself. Love also testified that he had witnessed Gibson using cocaine regularly during this period. If true,

Love's account would have called into question Gibson's claim at trial that he had reformed himself since his arrest and, more generally, added to the picture of Gibson's unsavory history. It might also have lent support to the notion that Gibson never in fact gave the $23,000 in buy money to Hubbard on May 18 (although Gibson was searched before and after that meeting). The district court, however, having heard Love's testimony (as well as a number of other witnesses confirming that Love had provided similar information to the government following his arrest),[13] found him incredible in every respect (Tr. July 19–21, 1993 at 381–83) and denied the motion for a new trial.

■ Hubbard contends that district court erred in refusing to grant him another trial, but he has failed to demonstrate a basis for reversal. The grant of a new trial is within the district court's discretion, subject to highly deferential appellate review. *United States v. Veras,* 51 F.3d 1365, 1373 (7th Cir.1995). In this case, the court's decision turned on its belief that Love was an incredible witness. *See United States v. Balistrieri,* 779 F.2d 1191, 1225–26 (7th Cir.1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). Like any other finding of fact, a credibility assessment is binding on appeal unless the district judge has chosen to credit *exceedingly* improbable testimony. *Veras,* 51 F.3d at 1371. Although, as Hubbard points out, other witnesses (including Love's attorney and a federal agent) were able to confirm that Love had spoken of Gibson's drug use and "scamming" as early as 1991 (and thus that his testimony was not *recently* invented), they had no personal knowledge of the matters to which Love testified and thus could not corroborate the substance of Love's allegations. Their testimony does not therefore call into question the district court's conclusion that Love was

---

**12.** For example, when Hubbard and Gibson left telephone numbers on one another's pagers, they typically added a three-digit code that would identify themselves as the source of the page. Tr. II 31–34.

**13.** Although Love had made these claims to the government in advance of Hubbard's trial, Hub-

bard does not contend that the Assistant United States Attorneys who prosecuted him were aware of this information or that they breached their duties under *Brady v. Maryland* and *United States v. Bagley* to disclose it to the defense. He has simply treated Love's testimony as newly discovered evidence.

not telling the truth. The district court, having presided over two trials of the narcotics charges, having twice heard Gibson testify subject to rigorous cross-examination, and having heard Love himself testify, was in a unique position to gauge the veracity of Love's testimony concerning Gibson. We find no error in its conclusion that Love was incredible, and thus no abuse of discretion in its decision not to grant Hubbard a new trial. *See United States v. Imran,* 964 F.2d 1313, 1318–19 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992); *United States v. Snoddy,* 862 F.2d 1154, 1157 (5th Cir.1989).

AFFIRMED.