UNITED STATES of America,
Plaintiff–Appellee,

v.

Curtis R. FAIR, Sr., Defendant–
Appellant.

No. 03–2583.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 13, 2003.

Decided Nov. 18, 2003.

Richard H. Lloyd, Office of the United States Attorney, Fairview Heights, IL, for Plaintiff–Appellee.

Andrea L. Smith, Office of the Federal Public Defender, East St. Louis, IL, for Defendant–Appellant.

Before POSNER, RIPPLE, and WILLIAMS, Circuit Judges.

### ORDER

In 2000 Curtis Fair, Sr. ("Fair"), pleaded guilty to possession of a firearm by a felon and was sentenced to 37 months in prison and 36 months of supervised release. While Fair was on supervised release, the United States Probation Office petitioned to revoke the term because Fair allegedly had committed a home invasion and aggravated battery. After a hearing, the district court concluded that Fair indeed had committed these state crimes in violation of the condition that he commit no offense while on supervised release. The district court revoked Fair's release and sentenced him to 24 months of imprisonment. On appeal Fair argues that the court erred in discrediting the witnesses

he called to establish an alibi and prove that it was his son, Curtis Fair, Jr. ("Curtis, Jr."), who actually committed the crimes.

## BACKGROUND

At the revocation hearing, the prosecution first called Fair's probation officer, Christopher Origliosso. Origliosso testified that in April 2003 Lakesha Rhodes called and told him that Fair had broken into her residence around 11 p.m. the night before and "pistol whipped" her daughter, Janet Rhodes. Origliosso stated that when he interviewed Janet two days later, she confirmed her mother's story that Fair kicked in the Rhodes' front door, placed a gun to Janet's head, and accused Janet of breaking into his mother's home the previous night. Origliosso recounted that Janet said that Fair had dragged her down the stairs and through the yard saying, "Bitch, I'm going to kill you if you don't tell me who broke in my momma [sic] house." Origliosso added that Janet told him that she knew Fair prior to the home invasion. Origliosso also testified he interviewed Bruce Darnell Bradley, a 9–year–old boy who was present during the home invasion. Bradley told him that at approximately 11 p.m. a man on the front lawn stated he was "Bootie's dad," and he needed to talk to a grown-up. Origliosso asserted (and Janet subsequently confirmed) that "Bootie" was a nickname for Fair's son, Curtis, Jr.

The prosecution then called Janet Rhodes. Janet testified that Fair kicked in her door, pulled her off the couch and down the steps, hit her in the head with a gun approximately five times, and then left in a car with possibly three other occupants inside that stopped to pick him up. Janet asserted that she had never seen Fair before that night, but she did know Fair's son, Curtis, Jr., because he was her sister's boyfriend. She stated that she knew it was Fair when he broke into the house because he said, "Bitch, why you

break in my momma [sic] house?" Janet explained that she knew that Curtis, Jr.'s, grandmother's house had been burglarized, so when the perpetrator said "momma," she concluded he was Fair. Janet identified Fair in court as the man who broke into her house and assaulted her.

On cross examination, Janet was questioned about several apparent inconsistencies. First, Janet had testified that she had never seen Fair before the home invasion, which conflicted with Origliosso's testimony that when interviewed Janet had told him that she already knew Fair before the home invasion, When asked about Origliosso's testimony, Janet asserted that despite what the probation officer said she had never met or even seen Fair prior to the home invasion and battery. Secondly, the 9–1–1 operator's typewritten summary of Janet's call to the police was admitted into evidence. The operator wrote that Janet said it was her sister's ex-boyfriend who broke into her home. Janet adamantly denied saying this to the operator and explained that she had told the operator that the intruder was "her sister's ex-boyfriend [sic] daddy."

For his part, Fair tried to establish an alibi through four witnesses, Sherry Schooler, Ren'eil Smith, Melva Perkins, and Brenda Tripp. Schooler, Fair's girlfriend, testified that she and Fair were at a bar on the night of the attack from approximately 5 p.m. until Perkins, her cousin's wife, picked them up shortly before midnight and drove them to Schooler's house. Smith, Fair's friend, testified that he was already at the bar when Fair and Schooler arrived around 4 p.m., after which they all played pool, threw darts, and played cards until Fair and Schooler left together at approximately 11:45 p.m. Perkins testified that she and her husband first went to the bar at approximately 10:50 p.m. to borrow Schooler's car. At

that time, Perkins said she saw both Fair and Schooler, whom she returned for at approximately 11:45 p.m. and then drove to Schooler's house.

Brenda Tripp, an investigator for the Federal Public Defendant's office, also testified on Fair's behalf. The day before the hearing, Tripp had interviewed Bradley, the 9–year–old boy who was present during the home invasion. The defense had expected the government to call Bradley as a witness, and when the government did not, Tripp instead testified about her interview with him. Tripp quoted Bradley as saying that he overheard Janet tell his mother that during the home invasion the perpetrator had said to Janet, "Why did you break in my grandma's house?" "Grandma" suggests that the perpetrator was Curtis, Jr., rather than Fair. Tripp's account conflicted with Origliosso's testimony that Bradley told him that a man on the front lawn had stated he was "Bootie's" dad, so Origliosso contacted Bradley during a recess. When the hearing resumed, Origliosso reported back that Bradley had confirmed that he heard the intruder identify himself as "Bootie's dad." Origliosso did not say, however, whether he asked Bradley about his purported reference to "grandma" during the interview with Tripp. Ultimately, the district court explained that it was not giving much weight to either Tripp's or Origliosso's interviews with Bradley because "all we have are conflicting hearsay interviews."

The district court found Schooler, Smith, and Perkins not to be credible: "Ms. Schooler and Mr. Smith both showed a bias. Ms. Perkins I felt was being pushed to stretch her story, perhaps even fabricate something, and in her nervousness revealed her emotions, adversely affecting her credibility." The court also suggested—without any explanation—that Smith might actually have been involved in the home invasion and assault. On the other hand, the court found Janet Rhodes, who identified Fair as her assailant, to be credible. The court did not discuss Origliosso's credibility.

## ANALYSIS

We review the district court's factual determinations for clear error and will affirm so long as the court's findings are plausible in light of the evidence. *Piggie v. Cotton*, 342 F.3d 660, 663 (7th Cir.2003). Special deference is given to determinations based on credibility findings, which "can virtually never be clear error," *id.*; see *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), because the district court had the opportunity to observe the witnesses including their reactions, responses, expressions, attitudes, tones of voice, eye contact, postures, body movement, and speech patterns, *United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir.1999). A credibility assessment is binding on appeal unless the district judge has chosen to credit exceedingly improbable testimony. *United States v. Hubbard*, 61 F.3d 1261, 1278 (7th Cir.1995).

Here, Fair essentially asks us to reassess the credibility of his witnesses and conclude that the district court misunderstood their testimony and speculated for no reason that his friend Smith participated in the home invasion and battery. Fair submits that the court must have misunderstood Smith's testimony because—according to Fair—the court unfairly characterized Smith's account of what Fair did between 10:45 p.m. and 11:45 p.m. as "vague" in contrast with his supposedly precise story about the rest of the evening. After reading Smith's testimony, we tend to agree with Fair that Smith's account of that hour was no less specific than the rest of his account regarding the entire evening. Smith testified that Fair and

Schooler arrived around 4 p.m., they all played darts, cards, and pool throughout the night, Perkins picked up Schooler's car around 11 p.m., and when Perkins returned about 11:45 p.m., Smith walked Schooler and Fair out to the car. In addition, Fair submits that the district court unfairly speculated that Smith may have been involved in the home invasion and battery as evidenced by the court's statement that it was "not sure whether Mr. Smith was part of what I'll call the three-man posse that was in the car that went with defendant." Fair correctly asserts that there is no evidence in the record that even remotely supports the court's suggestion that Smith was involved. In this regard, Janet gave no description at all about the occupants in the car that picked up her assailant.

Nonetheless, Fair's position runs up against the rule that we will not reassess the credibility of witnesses. *United States v. Starks,* 309 F.3d 1017, 1021 (7th Cir. 2002); *United States v. Griffin,* 310 F.3d 1017, 1022 (7th Cir.2002). The district court was presented with two distinct possibilities: Fair committed the home invasion and battery just like Janet said at the revocation hearing, or, alternatively, Curtis, Jr., committed the crime and for whatever reason Janet lied about Curtis, Jr.'s involvement. The district court believed the former possibility. *See Anderson,* 470 U.S. at 574 ("[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Although the district court's assertion, without any supporting evidence, that Smith might have participated in the crime is troubling, it ultimately credited Janet's testimony that Fair was the perpetrator. If there are questions about Janet's testimony, the district court was aware of them. Different factfinders might reasonably have disagreed about how to weigh the evidence in this case, but a decision can only be clearly erroneous if one "is left with the definite and firm conviction that a mistake has been made." *Id.* at 573; *see United States v. McDonald,* 22 F.3d 139, 144 (7th Cir.1994).

AFFIRMED.