In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1412

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CLEMITH L. MCCRAY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 20011—**Michael P. McCuskey**, *Chief Judge.*

ARGUED JANUARY 11, 2006—DECIDED FEBRUARY 9, 2006

Before FLAUM, *Chief Judge,* and EASTERBROOK and
MANION, *Circuit Judges.*

FLAUM, *Chief Judge.* Clemith McCray was charged
with three counts of distribution of cocaine base. He was
found guilty of counts II and III, but was acquitted of count
I. During his trial, the district court judge asked questions
of two witnesses: the confidential informant that the
government alleged had purchased drugs from McCray and
a police officer involved in the case. In a motion for a new
trial, McCray alleged that the district court's questions
showed a bias toward the prosecution and tainted the jury's
verdict. The district court ruled against McCray's motion.
He now appeals on the same basis.

## I. Background

Clemith McCray was charged with distributing crack cocaine on three dates during the summer of 2002: July 30, August 2, and August 14. These charges resulted from "controlled buys" by a confidential informant, Richard Wright. On all three occasions, Wright met with McCray at locations in Champaign, Illinois. Before Wright met with McCray, an agent thoroughly searched Wright for any drugs or money. After police concluded that Wright was not carrying either, he was given money to purchase drugs from McCray. These meetings were taped by agents from a distance.

After the July 30 meeting, which took place at a Champaign residence, Wright delivered to the police three small rocks of crack cocaine wrapped in a napkin. The rocks contained exactly 1 gram of crack cocaine. After the August 2 meeting, which took place in a parking lot, Wright delivered a bag containing 6.6 grams of crack cocaine. After the August 14 meeting, which also took place in a parking lot, Wright delivered a bag that contained 6.1 grams of crack cocaine.

Videotapes of all three meetings were admitted into evidence and shown to the jury at trial. The July 30 recording was videotaped at some distance from where Wright and McCray allegedly met. Another man was present in the video, and Wright briefly stepped outside of the view of the camera. The August 2 and 14 tapes were recorded from a lesser distance, and only Wright and the defendant were present. The August 14 recording reflected a hand-to-hand exchange between Wright and the defendant, and the defendant was wearing a name tag on his shirt that read "Clemith."

Wright testified that McCray was the man he met with on all three occasions, and that he had purchased crack cocaine from McCray on the dates and in the amounts reflected in

the indictment. On cross examination, McCray's counsel began to impeach Wright with his criminal history, his motive to cooperate with law enforcement, and his history of drug use. The district court interrupted the cross examination shortly after Wright admitted that he would do many things to get money to support a former heroin habit, including "street hustling, stealing, borrowing, begging, and panhandling." The exchange was as follows:

DEFENSE COUNSEL: Did you ever lie to get money to buy drugs?

WRIGHT: Yes.

DEFENSE COUNSEL: Often?

WRIGHT: Not really, because I would do other things. Wasn't that many people to lie to that would trust an addict. So you would have to resort to other things.

DISTRICT COURT: When you say lie, do you mean like if I was walking by you and you'd ask, "Would you give me some money for food?"

WRIGHT: Yes.

DISTRICT COURT: —that would be a lie because you intended to use the money for drugs?

WRIGHT: True.

DISTRICT COURT: And that's what you call panhandling? Hustling?

WRIGHT: Well, that's answering his question, like, would I lie for

|                    | some money for drugs. Pan-handling I would walk up to you and just say, "Can you help me?" You know, in an-other—well it all falls in the same— |
|--------------------|----------|
| DISTRICT COURT:    | But sometimes you'd say for food, and it wasn't for food and— |
| WRIGHT:            | Right, cup of coffee— |
| DISTRICT COURT:    | Can you help me? I'm home— |
| WRIGHT:            | —transportation, or some-thing like that. |
| DISTRICT COURT:    | Okay. |

Shortly after that exchange, the district court again interrupted defense counsel's cross examination:

| DEFENSE COUNSEL:   | And you would, you would do just about anything to get those drugs if you had to have them, wouldn't you? |
|--------------------|----------|
| WRIGHT:            | There's certain things I wouldn't do. |
| DEFENSE COUNSEL:   | Such as? |
| WRIGHT:            | My mom—well, she's de-ceased now; but certain things I wouldn't, you know, do to my mother. |
| DISTRICT COURT:    | Well, let me ask you this. In listening to your crimes, I haven't heard anything about you beating people up to take money from them. So if I |

walked by and you asked me for some money for coffee and I didn't give it to you, would you grab me, beat me up, throw me down, and take my money?

WRIGHT:            No, I never, I never had to go to that extreme.

DISTRICT COURT:   Okay.

The court again interrupted the cross examination during a line of questioning concerning how thoroughly police searched Wright before he made the controlled purchases:

DEFENSE COUNSEL:  How were you searched?

WRIGHT:           I was—my pants was pulled down, shoes was taken off, socks unrolled, made me lift my shirt because I had on a T-shirt. And they went through my pockets, went through a couple of my— what else went through? That's pretty much—

DISTRICT COURT:   They put their hands on your underwear?

WRIGHT:           Yes.

DISTRICT COURT:   So if you'd have had drugs hidden in your underwear, would they have found them?

WRIGHT:           Yeah. Because I had on, like, you know, jogging like shorts.

DISTRICT COURT:   Boxers?

WRIGHT:           Yes, the jogging, like, kind.

Jon Swenson, a lieutenant with the Champaign Police Department, helped with the investigation. He identified McCray in the courtroom as the person that he observed meeting with Wright on August 2, 2002, as he watched the meeting from a distance. The court interrupted the prosecutor's examination of Swenson:

| | |
|---|---|
| PROSECUTOR: | Lieutenant Swenson, how long have you known the defendant? |
| SWENSON: | Since probably the early to mid '90s. I'll say '92, '93, somewhere in there. |
| PROSECUTOR: | I don't want to go into the details of how you know him, but let me ask you: Have you viewed—as part of knowing who he is, have you reviewed photographs of him? |
| SWENSON: | Yeah. I've had occasion to put the name and the face together through my, in my professional capacity, yes. |
| PROSECUTOR: | Can we have— |
| DISTRICT COURT: | Have you met him personally before? |
| SWENSON: | You know, I—discussing this with [the prosecutor] before the trial, one of my habits early in my career used to be that at my lunch hour I went into a room that we called the IDMO room. It was just photos that were broken down by male, female, black, |

|                   |                                          |
|-------------------|------------------------------------------|
|                   | white, height, weight; and what I would do is go in there, and I would spend my lunch hour thumbing through these photos trying to memorize people whose names I had heard and who I knew were involved in any activity involving— |
| DEFENSE COUNSEL:  | Objection, Judge, calls for an answer—   |
| DISTRICT COURT:   | Jury will disregard the response. That's not what I asked. |
| SWENSON:          | I—                                       |
| DISTRICT COURT:   | I asked if you met him personally.       |
| SWENSON:          | And I cannot tell you whether it was through that process or through personal contact on the street. |

Before beginning his cross examination, defense counsel requested to approach the bench. The district judge reminded counsel that he did not entertain sidebars, but sent the jury out and heard the objection. Defense counsel moved for a mistrial on the basis of Swenson's comments about how he knew McCray. The district judge asked the court reporter to read back Swenson's remarks, then ruled that a mistrial was not necessary. The judge believed that he stopped the comment before any truly prejudicial information was revealed, and further noted that the jury had been instructed to disregard the statement.

At the end of the trial, the judge instructed the jury that nothing he did or said was meant to reflect his opinion

about the facts of the case or what the verdict should be.

The jury found McCray not guilty on count I, which was based on the July 30 encounter, but found him guilty on counts II and III, which were based on the two encounters in August. McCray filed a motion for acquittal and a motion for a new trial, both of which were denied. The claims made in the motion for a new trial were the same ones pursued here on appeal. McCray was sentenced to 360 months imprisonment on each count, with the sentences to run concurrently, and 8 years of supervised release. He was also ordered to pay a small fine.

McCray claims that he is entitled to a new trial because the judge's questioning showed a bias toward the prosecution, because the questions "rehabilitated Wright in a manner a prosecutor might," and "opened the door to the jury's consideration that Mr. McCray may have been identified from police photographs." He further alleges that these errors caused him prejudice. The government contends that defense counsel did not object to the court's questions during trial, and the claim is therefore forfeited on appeal and reviewed only for plain error. Moreover, the government claims that the questions did not display a bias, and that even if they did, the jury instructions would have cured any effect that might have had on the jury. The government also argues that no prejudice resulted from the questioning.

For the following reasons, we now affirm the district court's denial of a new trial.

## II.  Discussion

"Federal judges have wide discretion to determine the role that they will play during the course of a trial." *United States v. Washington*, 417 F.3d 780, 783-84 (7th Cir. 2005) (citing *United States v. Verser*, 916 F.2d 1268, 1272 (7th Cir.

1990)). Federal Rule of Evidence 614(b) allows a judge to question witnesses, even those called by a party to the action. "A district judge is free to interject during a direct or cross-examination to clarify an issue, to require an attorney to lay a foundation, or to encourage an examining attorney to get to the point." *Washington*, 417 F.3d at 784 (citing FED. R. EVID. 614(b); *United States v. Reynolds*, 189 F.3d 521, 528 (7th Cir. 1999)). The judge may not assume the role of an advocate, however. *Id.*

If a party claims that a judge favored the opposing party during questioning, the court evaluates the claim in a two-step inquiry. "First, we inquire whether the judge in fact conveyed a bias regarding the defendant's dishonesty or guilt. If so, we consider whether the complaining party has shown serious prejudice resulting from the district court's comments or questions." *Id.* at 784 (citations omitted).

In this case, even assuming that the district court's questions showed a bias toward the prosecution, we are unable to find that they prejudiced McCray. The defendant's only argument related to prejudice is as follows:

> [The jury's finding of not guilty on] count 1 of the indictment, in spite of the fact that a videotape of that meeting between Wright and Mr. McCray was shown to the jury, indicates that the evidence was not so overwhelming as to render harmless the court's questioning. Serious prejudice resulted from the questioning such that it colored the jury's perception of the court's attitude toward the credibility of Richard Wright and the background of Mr. McCray.

Contrary to McCray's assertions, the acquittal on count I does not indicate that the state's evidence on counts II and III was insubstantial. The tape from July 30 was far inferior to the tapes made in August. The view of the suspect was not as good because the cameraman was

standing farther from the transaction, another party was present for that exchange, and McCray stepped briefly out of the view of the camera. No such problems existed in the videotapes of the transactions that formed the basis of counts II and III. Indeed, the August 14 videotape included additional details, recording a hand-to-hand transaction and a name tag that read "Clemith." These additional details made that tape much more damaging to the defense than the comparatively fuzzy tape of the July 30 transaction. It is not appropriate, therefore, to assume that the state's evidence on counts II and III was thin.

The acquittal on count I indicates that the jury was not willing to base a conviction on Wright's testimony. Wright testified that he received the drugs from McCray on July 30, yet the jury did not convict McCray of that conduct. Therefore, any "rehabilitation" that might have occurred during the judge's questioning did not cause the jury to take Wright's word at face value.

Similarly, the acquittal on count I indicates that, even if the jury believed that McCray had a criminal history based on Swenson's comment, it was not willing to convict on that basis alone (or combined with Wright's testimony regarding the transactions). McCray would have had the same criminal history on July 30 as he did in August. Therefore, Swenson's comments were also harmless.

Moreover, we have no reason to believe that the jury disregarded the judge's instruction that nothing he did or said was meant to reflect any opinion on his part about the facts of the case or what the verdict should be. We have held that such instructions reduce the risk of any prejudice from the court's questioning, *United States v. Evans*, 994 F.2d 317, 324 (7th Cir. 1993), and we believe that the instruction was effective here.

Although we conclude that this defendant was not prejudiced by the district court's inquiry, we express some concern over the judge's decision to proceed with

extensive questioning. When coupled with the trial court's practice of not permitting sidebars, the judge's questions in this case arguably placed the defendant's lawyer in an awkward position. Defense counsel was faced with either passively accepting what he perceived to be an unwarranted examination or potentially exacerbating the situation by challenging the judge's impartiality in front of the jury. To avoid the risk of unforeseen prejudice, we encourage district judges to remain vigilant to the potential impact of their questions during a jury trial.

## III. Conclusion

We find no prejudice from the judge's questioning and, consequently, no basis on which to grant a new trial. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*