# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2780

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARSHALL L. BLANCHARD,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 20015—**Michael P. McCuskey**, *Chief Judge.*

———————

ARGUED APRIL 3, 2008—DECIDED SEPTEMBER 8, 2008

———————

Before FLAUM, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Marhsall Blanchard was tried and convicted of one count of manufacturing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He challenges both convictions on a variety of grounds, including the denial of his pretrial motions for a bill of particulars and severance, the alleged constructive amend-

ment of the indictment, the sufficiency of the evidence, and the introduction at trial of certain comments, originally made at a pretrial suppression hearing, by the district court judge. Blanchard also challenges his sentence, contending that the district court erroneously applied certain enhancements in calculating the advisory guidelines range. For the reasons set forth in this opinion, we vacate Blanchard's convictions and remand for a new trial.

## I. Background

The Defendant, Marshall Blanchard, owned two homes, one in Roberts, Illinois, and the other in Paxton, Illinois. The two towns are roughly 15 miles apart in east-central Illinois. Blanchard acquired and moved into the Roberts home no later than sometime during the year 2001, the same year in which he separated from his ex-wife.

With the exception of a seven-month period during 2003, Blanchard's son, Marshall Jr.,[1] lived with him at the Roberts residence. In the fall of 2001, Marshall Jr. removed several firearms—four rifles and two shotguns—from an enclosed porch area of the Roberts residence and delivered them to a family friend's place of business for storage. He later returned the same firearms to the porch area of the Roberts residence, but more on that later.

---

[1] Because the Defendant, Marshall Blanchard, and his son, Marshall Blanchard Jr., share the same name (apart from the "Jr." designation), for the sake of clarity, we hereinafter refer to the Defendant as "Blanchard" and to his son as "Marshall Jr."

After moving out of the Roberts residence in February 2003, Marshall Jr. returned sometime in August 2003. At that time, he was twenty years old and studying criminal justice at a local college. During the summer of 2004, Marshall Jr. began using the porch area of the Roberts residence as his bedroom. In order to enjoy exclusive access to his bedroom, Marshall Jr. installed a lock on the door leading to the porch area from the interior of the house and kept the only key for himself. In October or November of 2004, Marshall Jr. retrieved the aforementioned firearms from the family friend's place of business and returned them to the porch area at the Roberts residence. Those firearms remained in the porch area of the Roberts residence throughout the remainder of 2004.

Meanwhile, during the late summer and fall of 2004, Marshall Jr. began to notice peculiar physical and behavioral changes in his father. He noticed that Blanchard lost considerable weight, had blemishes and sores on his face, did not sleep much, and seemed unusually agitated. In addition, Blanchard regularly entertained visitors, some of whom Marshall Jr. did not know; however, he did know the most frequent visitor, Cynthia Blanding.

Blanding and Blanchard met in mid-October 2004. At that time, Blanding was in the process of moving out of her home, from which she had been evicted. Blanding and Blanchard became romantically involved, and Blanchard offered to let Blanding stay at the house in Paxton, which she did on occasion. She also stayed overnight with Blanchard on several occasions at the Roberts residence.

One day in the last week of December 2004, Marshall Jr. was home alone at the Roberts residence. He noticed a

strong, ammonia-type smell coming from the sink; upon inspection, he observed a strainer and some glass jars in the sink. The following day, he arrived home early from work and discovered two plastic bottles containing an "off-white crystal" substance. He opened one of the bottles and encountered a strong ammonia-type odor. Marshall Jr. recalled information that he had learned about methamphetamine in his criminal justice studies; at this point, putting the off-white substance together with his father's recent physical and behavioral changes, he suspected that the substance was methamphetamine. Marshall Jr. photographed the bottles with his digital camera and took a spoon-sized sample of the off-white substance; he then went to see his mother, Lori Blanchard. After discussing his suspicions and concerns with her, Marshall Jr. left Lori with the sample of the off-white substance and a disk containing the photos from his digital camera. Lori then contacted the Roberts chief of police, Randy Kinzinger, and delivered these items to him. The off-white substance tested positive for ephedrine, a commonly used ingredient in the manufacture of methamphetamine.

Shortly thereafter, on December 30, 2004, law enforcement officers executed search warrants at both the Roberts and Paxton residences. At both residences, officers seized items that, although innocuous when viewed individually and in isolation, might nonetheless be used, as a group, for methamphetamine manufacturing. At the Paxton residence, for example, officers seized camp fuel containers, a sulfuric acid container, filters, salt, a gas mask, and pseudoephedrine packaging; cleaning officials later encountered hazardous substances, including anhy-

drous ammonia, at that residence. And at the Roberts residence, officers seized, among other things, numerous coffee filters, an anhydrous ammonia tank, and a propane tank. And not only was there "smoke," but also "fire"; officers seized 9.8 grams of a substance containing methamphetamine from the Paxton residence and 69 grams of a substance containing methamphetamine from the Roberts residence. In addition, at the Roberts residence, officers seized .01 grams of methamphetamine from the nightstand in Blanchard's bedroom and .10 grams of methamphetamine from a plastic plate beneath his bed. At the Roberts residence, officers also seized four rifles and two shotguns from the aforementioned enclosed porch area, and they seized a .32-caliber revolver and ammunition from underneath the mattress in Blanchard's bedroom.

On April 8, 2005, Blanchard was charged in a federal indictment with one count of manufacturing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Count One), and one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Two). The indictment alleged that both offenses occurred "on or about December 30, 2004."

Blanchard's trial began on March 27, 2006. At trial, the government presented the evidence seized from both residences, as well as expert testimony opining that a "meth lab" existed at the Paxton residence and that materials consistent with the manufacture of methamphetamine were found at the Roberts residence. Marshall Jr. testified regarding his observations in late 2004 that

led him to suspect that his father was using methamphet-
amine. He also testified regarding the firearms seized
from the porch area of the Roberts residence; he ex-
plained that all but one of the guns belonged to his father,
that his father controlled and directed both the 2001
removal and the 2004 retrieval/return of those firearms,
and that he stopped using the porch area of the Roberts
residence as his bedroom in September or October 2004,
allowing his father unfettered access to the porch area
throughout the remainder of the year. Blanding, testifying
on behalf of the government pursuant to an immunity
agreement, testified that Blanchard allowed her to use
the Paxton residence for methamphetamine manufactur-
ing, and that in exchange, she supplied him with metham-
phetamine. In addition, she testified that Blanchard
sometimes supplied materials and assisted in the manu-
facturing process. She further testified that on or about
Christmas Eve 2004, she and Blanchard completed the
manufacture of a quantity of methamphetamine at the
Roberts residence. Finally, she testified that Blanchard
had shown her a handgun that he kept beneath the mat-
tress in his bedroom at the Roberts residence.

The trial concluded on March 31, 2006, with the jury
finding Blanchard guilty on both counts. The district court
rejected Blanchard's post-verdict motion for judgment of
acquittal, characterizing the evidence in support of
both counts as "overwhelming." The court sentenced
Blanchard to 150 months' imprisonment on Count One
and 120 months' imprisonment on Count Two, to be
served concurrently. In addition, the court sentenced
Blanchard to three years of supervised release and a $100

special assessment. Blanchard timely filed this appeal, challenging both his convictions and his sentence.

## II. Discussion

On appeal, Blanchard challenges both convictions on a variety of grounds, including (1) the denial of his pretrial motions for a bill of particulars and a severance; (2) an alleged fatal variance between the date specified in the indictment and the evidence presented at trial, resulting in constructive amendment of the indictment; (3) certain statements made by the trial judge at a pretrial suppression hearing and subsequently introduced at trial; and (4) the sufficiency of the evidence. We address these arguments in turn below. Blanchard also challenges his sentence, but in light of our conclusion with regard to his convictions, we need not address that challenge.

### A. Pretrial Motions for Bill of Particulars and Severance

Before trial, Blanchard moved for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). The indictment alleged that Blanchard committed both the methamphetamine manufacturing offense and the firearms offense "on or about December 30, 2004, in the Central District of Illinois." In moving for a bill of particulars, Blanchard sought more specific information concerning the time and place of the alleged offenses, as well as the identity of the firearm (or firearms) alleged in

Count Two. The district court denied that motion, finding that "the charges are not complex, the indictment is sufficiently clear, and Defendant has been provided with discovery regarding the charges." Blanchard now appeals, contending that the denial of this motion deprived him of an adequate opportunity to prepare for and meet the government's evidence at trial.

We review the trial court's discretionary decision to deny a motion for a bill of particulars deferentially, reversing only upon an abuse of that discretion. *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003); *see also United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). We will reverse only upon a showing of actual prejudice to the defendant. *Hernandez*, 330 F.3d at 975.

Our bill-of-particulars analysis is similar to our constitutional sufficiency-of-the-indictment analysis; in both cases, the key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation. *See Fassnacht*, 332 F.3d at 446; *see also Hernandez*, 330 F.3d at 975 ("[A] bill of particulars [is] unnecessary where the indictment sets forth the elements of the charged offenses and provides sufficient notice of the charges to enable the defendant to prepare his defense."). Information relevant to the preparation of a defense includes the elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated. *See Fassnacht*, 332 F.3d at 446. Where the indictment fails to provide the full panoply of such information, a bill of particulars is nonetheless unnecessary

if the information "is available through 'some other satisfactory form,' such as discovery." *Hernandez*, 330 F.3d at 975 (quoting *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1992)).

Because Blanchard had ample access to the information necessary to prepare his defense, the district court did not abuse its discretion here. Although the indictment was somewhat sparse, Blanchard was the beneficiary of extensive pretrial discovery. For example, he received law enforcement reports concerning the searches of his two residences, the corresponding search warrants and supporting documents, and a report of his statements to law enforcement officers. Given knowledge of the evidence seized from both residences and the terms of the indictment, Blanchard was undoubtedly aware that the government might seek to prove that he manfuctured methamphetamine at either residence and that he possessed firearms at the Roberts residence on a date approximating the "on or about" date alleged in the indictment. This was more than sufficient to enable Blanchard to prepare for trial. *See Fassnacht*, 332 F.3d at 446 (noting that "the defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved" (quoting *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981))). Therefore, the district court did not abuse its discretion in denying Blanchard's motion for a bill of particulars.

Before trial, Blanchard also moved to sever Counts One and Two for separate trials pursuant to Federal Rules of Criminal Procedure 8(a) and 14. He now appeals the

district court's denial of that motion, arguing that the joinder of the drug and firearms offenses was improper and unduly prejudiced him at trial. Although Blanchard waived the Rule 14 severance aspect of this motion by failing to renew it at the close of the evidence, *see United States v. Ross*, 510 F.3d 702, 711 (7th Cir. 2007) (explaining that a Rule 14 motion for severance is waived if not renewed at the close of the evidence), the Rule 8 misjoinder aspect of the motion, though also not renewed, was properly preserved. S*ee id.* at 710 n.1 ("A defendant need not renew a Rule 8 motion at the close of the evidence to preserve the argument for appeal.").

We review Blanchard's misjoinder claim de novo, focusing on the face of the indictment rather than the evidence adduced at trial. *Id.* at 710; *see also United States v. Lanas*, 324 F.3d 894, 899 (7th Cir. 2003). Federal Rule of Criminal Procedure 8(a) permits joinder of offenses where they are (1) "of the same or similar character," (2) "based on the same act or transaction," or (3) "constitute parts of a common scheme or plan." We construe this rule broadly in the interest of conserving judicial resources and avoiding costly, duplicative trials. *United States v. Nettles*, 476 F.3d 508, 516 (7th Cir. 2007); *United States v. Rollins*, 301 F.3d 511, 518 n.1 (7th Cir. 2002). Even where misjoinder occurs, we will not reverse unless the defendant can show actual prejudice—i.e., that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Ross*, 510 F.3d at 710-11 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)); *see also United States v. Hubbard*, 61 F.3d 1261, 1271 (7th Cir. 1995).

The first obstacle to Blanchard's misjoinder argument is our presumption that, because of the close relationship between drug trafficking and firearms offenses, joinder of such offenses is ordinarily proper. *See United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000). This presumption arises from the "natural inferences that may be drawn from the contemporaneous possession of guns and drugs or drug paraphernelia: the firearm is an indication of drug activity, and participation in drug trafficking supplies a motive for having the gun." *Id.* (quoting *Hubbard*, 61 F.3d at 1270). Although that presumption might be overcome by, for example, a significant temporal disconnect between the alleged offenses, *see Hubbard*, 61 F.3d at 1271 (concluding that firearms and narcotics charges were misjoined where nearly a year and a half transpired between the two offenses), there was no such disconnect here; the indictment alleged that the methamphetamine manufacturing and firearms offenses occurred at approximately the same time, and evidence of both offenses was recovered from the Roberts residence. *See Stokes*, 211 F.3d at 1042; *United States v. Windom*, 19 F.3d 1190, 1197 (7th Cir. 1994) (explaining that "joinder of a weapons offense with drug charges is proper under Rule 8(a), especially when the weapons and drugs are found in the same search"). Therefore, the district court did not err in joining these offenses for trial under Rule 8(a).

Moreover, even if the offenses had been misjoined, the error would be harmless because Blanchard cannot show prejudice. *See, e.g., Ross*, 510 F.3d at 710-11; *Hubbard*, 61 F.3d at 1272. Blanchard points out that, absent joinder of

the two counts, the drug offense could have been tried without informing the jury that he was a convicted felon. Conceding this point, we are not convinced that the jury's knowledge of Blanchard's prior felony conviction had a "substantial and injurious effect or influence" on their deliberations. *Ross*, 510 F.3d at 711. As we explain in further detail below, the evidence of Blanchard's guilt on both counts was considerable, mitigating any risk that the jury's decision was influenced by knowledge that Blanchard had previously committed a felony. *See id.* Furthermore, the jury was properly instructed to consider each count and the corresponding evidence separately, not allowing their decision on one count to color their decision on the other. There is no reason to presume that they did not adhere to these instructions. *Id; see also United States v. Coleman*, 22 F.3d 126, 135 (7th Cir. 1994) (explaining that where the "jury [is] instructed to consider each count and the relating evidence separately . . . there [is] no reason to suppose that it would disregard this mandate" (citation omitted)).

To recap, the district court did not abuse its discretion in denying Blanchard's motion for a bill of particulars, because Blanchard was properly apprised of the charges against him and was the beneficiary of extensive pretrial discovery that filled in any gaps in the somewhat-sparse indictment; thus, he was not denied the opportunity to adequately prepare for trial. In addition, Blanchard has demonstrated neither misjoinder of the drug and firearms counts nor prejudice. Accordingly, the district court did not err in joining Counts One and Two for trial. Blanchard waived the Rule 14 aspect of his motion by failing to

renew it at the close of the evidence, but even if it had not been waived, his inability to show prejudice would doom this claim as well.

### B. Constructive Amendment of Indictment

Blanchard next argues that there was a fatal variance between the date alleged in the indictment—on or about December 30, 2004—and the evidence presented at trial regarding the date (or dates) on which he manufactured methamphetamine, thereby constructively amending the indictment in violation of the Fifth Amendment. Blanchard's argument focuses primarily on Blanding's testimony. At trial, she testified that she manufactured methamphetamine with Blanchard on several occasions in November and December 2004, and that the last occasion was on "Christmas Eve or right before Christmas." However, on cross-examination, Blanding conceded that she could be no more specific than "on or before Christmas Eve," acknowledging that her memory was impaired because she was using methamphetamine regularly in late 2004. In addition, a government expert conceded on cross-examination that he could not definitively state when the "meth lab" at the Paxton residence was created, and that it might have been created as many as six months earlier. Thus, Blanchard argues, the government's evidence regarding methamphetamine manufacturing is too temporally indefinite—spanning a period of up to six months—to sustain a conviction consistent with the "on or about" date alleged in the indictment.

Constructive amendment of an indictment occurs where the permissible bases for conviction are broadened

beyond those presented to the grand jury. *United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001). "To avoid running afoul of the Fifth Amendment, the allegations in the indictment and the proof at trial must match in order 'to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense.' " *Id.* (quoting *United States v. McKinney*, 954 F.2d 471, 480 (7th Cir. 1992)). However, where an indictment alleges that an offense occurred "on or about" a certain date, "the defendant is deemed to be on notice that the charge is not limited to a specific date" and "cannot make the requisite showing of prejudice based simply on the fact that the government has failed to prove a specific date." *Id.* at 391 (quoting *United States v. Leibowitz*, 857 F.2d 373, 379 (7th Cir. 1988)). Accordingly, where the "on or about" language is used, the government need not prove the exact date of the offense "as long as a date *reasonably near* that named in the indictment is established." *United States v. Ross*, 412 F.3d 771, 774 (7th Cir. 2005) (emphasis added) (reciting the "canonical formula" to be applied when the "on or about" language is used in the indictment); *see also Leibowitz*, 857 F.2d at 379 (citing collected cases).

The question, then, is whether the government presented evidence that would support a date "reasonably near" the date specified in the indictment, and we have little trouble answering this question in the affirmative. Blanding's testimony—that she and Blanchard manufactured methamphetamine on approximately December 24, 2004—provided a reasonable basis for the jury to conclude that Blanchard manufactured methamphet-

amine within days of the "on or about" date specified in the indictment, December 30, 2004. Although Blanding conceded on cross-examination that she could not pinpoint the exact date, such laser-like precision was not necessary for her testimony to support a date "reasonably near" that alleged in the indictment. *See, e.g., Leibowitz*, 857 F.2d at 379 (concluding that 21-day variance between date proved at trial and "on or about" date alleged in indictment was "reasonably near"). Moreover, the jury was expressly instructed not to convict unless they concluded that Blanchard manufactured methamphetamine on a day "reasonably near" that alleged in the indictment. C*f. Ross*, 412 F.3d at 774-75 (jury instructions expressly permitting more than four-year variance from "on or about" date impermissibly amended indictment). Indeed, because evidence was presented supporting a date "reasonably near" that alleged in the indictment, and because the jury was properly instructed on this issue, Blanchard's complaint is really directed to the facts found by the jury; however, that is a battle that Blanchard lost at trial, and which he may not re-fight here on appeal.

Finally, we note that one of the primary concerns underlying the prohibition on constructive amendments—the impairment of the defendant's ability to prepare his defense—is simply not implicated here. *See Folks*, 236 F.3d at 392. As already noted, extensive pretrial discovery afforded Blanchard more than sufficient notice of how the government might attempt to prove its case at trial. Indeed, Blanchard does not argue that he was unfairly surprised by the evidence produced or the theories proffered by the government at trial. For these reasons, there was no constructive amendment of Blanchard's indictment.

### C. Introduction at Trial of Court's Suppression-Hearing Statements

Blanchard next challenges the introduction at trial of certain statements originally made by the trial judge at a pretrial suppression hearing, styling his argument in terms of both judicial bias and prosecutorial misconduct. Before turning to the merits of Blanchard's arguments on this point, some additional background is necessary.

As already discussed, at trial, Marshall Jr. offered testimony that was damaging to his father's case. With respect to the firearms charge, he testified that his father owned all but one of the firearms seized from the porch area of the Roberts residence (the "porch firearms"), that his father directed him to remove those firearms from the residence in 2001 and return them in late 2004, and that his father enjoyed unfettered access to the porch area after September or October 2004. And with respect to the methamphetamine manufacturing charge, Marshall Jr. testified that he noticed certain physical changes in his father, including weight loss and facial sores, in late 2004. He also testified regarding his discovery of certain items in the Roberts residence, including the off-white substance that later tested positive for ephedrine, that led to the search of Blanchard's two residences and his subsequent arrest.

At the grand jury hearing nearly one year before trial, in April 2005, Marshall Jr. had offered testimony largely consistent with his eventual trial testimony. With respect to the porch firearms, he testified that Blanchard owned them and had ordered Marshall Jr.'s removal of them from the Roberts residence in 2001; because Lori

(Blanchard's ex-wife and Marshall Jr.'s mother) had moved out of the house, Blanchard, a convicted felon, could no longer plausibly deny possession by attributing ownership to her. Thus, Marshall Jr. and his father moved the guns to a family friend's place of business. When that friend died in 2004, Marshall Jr. testified, he obtained a Firearm Owner's Identification (FOID) card so that he could retrieve the firearms and return them to the Roberts residence while allowing his father, in the event that the firearms were discovered by authorities, to plausibly deny ownership/possession (distinct concepts which Blanchard may have incorrectly conflated).

However, following the grand jury hearing, at a pretrial suppression hearing on November 15, 2005, Marshall Jr. offered a remarkably different version of events. He testified that the porch firearms originally belonged to his mother but had passed down to him when she left the Roberts residence; his father was not part of the purported chain of ownership. In addition, Marshall Jr. testified that he removed those firearms from the Roberts residence in 2001 and returned them in 2004 of his own volition, without prompting or direction from his father. Finally, he testified that in late 2004, the porch area of the Roberts residence served as his "apartment," and he enjoyed exclusive access to that area by keeping it locked and maintaining possession of the only keys. In short, after testifying at the grand jury hearing that his father both owned and controlled the porch firearms, Marshall Jr. testified at the suppression hearing that his father did not own, control, or even have physical access to them.

When Marshall Jr. altered his story at the November 15 suppression hearing, the government (unsurprisingly) confronted him with his inconsistent grand jury testimony. On cross-examination, the government reminded Marshall Jr. that he was under oath and asked whether he would like to alter his testimony in light of his previous grand jury testimony.

> Q. Do you want to change your testimony at all in reference to your testimony that this house had a separate apartment under your sole control and that these guns were yours? Do you want to alter that testimony at all?
>
> A. I, I'm not sure. I don't, I don't understand.
>
> . . .
>
> Q. Do you want to be—do you want to persist in stating that this house had been sectioned off to where there's an area—I believe [defense counsel] referred to it as an apartment of yours that you had sole access to and that these guns were, were yours? Do you want to persist in that testimony?
>
> A. Yes.

(Suppression Hr'g Tr. 85-86.) The government then confronted Marshall Jr. with specific portions of his prior inconsistent testimony, including his indication that his father owned the porch firearms. The government also reminded Marshall Jr. of his testimony that, in order to protect his father (a convicted felon) in the event that the firearms were discovered by authorities, he and his

father had jointly removed the firearms from the Roberts residence in 2001 and then returned them in 2004, only after Marshall Jr. had procured an FOID card. During the course of this questioning, the court occasionally interjected its own questions, seeking clarification of Marshall Jr.'s answers.

The trial judge's comments that are the subject of Blanchard's current challenge came in response to a defense counsel objection in the midst of this cross-examination. Defense counsel objected when the government pointed out that Marshall Jr. had never described the Roberts residence porch area as his exclusively controlled "apartment" at the grand jury hearing, contending that this did not tend to impeach Marshall Jr. The court overruled that objection, and offered the following explanatory commentary:

> I believe it is [impeachment]. The Court finds it to be impeachment. The Court finds this witness not to be credible and that the testimony he has given today is not credible.
>
> The Court's had a chance to observe the manner and demeanor of his testimony. The manner and demeanor on direct was very assertive. . . . I determined that I would ask some questions. And as soon as I began questions about the ownership of the guns back in 2001—of course, I have no knowledge of the grand jury testimony—all of a sudden, the demeanor began changing dramatically, how he hangs his head, how he looks, how his facial mannerisms changed; and it was very obvious

> to me after 13 years of being a criminal lawyer
> and 17 years of being a judge—30 years of being
> experienced—that his answers all of a sudden
> became deceptive, less than credible.
>
> And, of course, now [the prosecutor] has asked
> him specific questions that lead me to the undeni-
> able conclusion that he has not been credible and,
> because he knew that his answers that he was
> giving were not the same answers he had given
> to the grand jury in April.

(Suppression Hr'g Tr. 92-93.) And at the conclusion of the
cross-examination, the government asked, "So would it
be accurate to say . . . that the testimony you've given
today under oath before this Court has been false and
misleading?" (*Id.* 100.) The court intervened, interposing
a Fifth Amendment objection on Marshall Jr.'s behalf.

Following the conclusion of the November 15 hearing,
Marshall Jr. had time to ponder the comments of the court
and the government, and he became concerned that his
testimony might lead to legal trouble; soon thereafter, he
contacted the government's case agent to express his
concern. They agreed that Marshall Jr. would meet with
the case agent and the prosecutor at the government's
office, and that meeting took place a few days later. At
that meeting, the case agent and the prosecutor advised
Marshall Jr. that they believed he had testified untruthfully
at the suppression hearing and that he could face perjury
charges. Marshall Jr. agreed to provide a tape-recorded
statement correcting those portions of his November 15
testimony that had been untruthful.

On December 12, 2005, at a follow-up hearing to complete argument on Blanchard's pending suppression motions, the court allowed the government to reopen cross-examination of Marshall Jr. On the reopened cross-examination, Marshall Jr. recanted those portions of the November 15 testimony that had contradicted his grand jury testimony. For example, Marshall Jr. testified that his father owned almost all of the porch firearms, that his father directed the 2001 removal and 2004 return of those firearms, and that his father enjoyed unfettered access to the porch area beginning sometime around October 2004 (when Marshall Jr. relocated his bedroom to another part of the house). Marshall Jr. also testified that, following his grand jury testimony, his father had not-so-subtly pressured him to change his testimony, telling him that the guns were his and that the porch area was his "apartment."

As previously noted, at trial, Marshall Jr. testified on behalf of the government and offered a version of events consistent with his grand jury testimony and his testimony at the December 12 hearing. In addition, he explained that he had testified untruthfully at the November 15 hearing, and that on cross-examination that day, the government had exposed discrepancies between his testimony and his prior grand jury testimony. He further testified that, following the November 15 hearing, he discussed his concerns about having testified untruthfully with his mother. Then, he explained, he contacted the government to express his concern that he might have gotten himself into trouble by testifying untruthfully, hoping to "resolve the issue." Marshall Jr. further testified that he was recalled to the stand at the December 12 hearing, and at

that time, he corrected those portions of his November 15 testimony that were untruthful.

As might be expected, defense counsel then sought to impeach Marshall Jr.'s testimony by showing his incentive to cooperate with the government based upon his fear of prosecution for perjury. First, defense counsel asked whether, following the November 15 hearing, anyone from the government initiated contact with Marshall Jr. either before or as he left the courtroom, and he indicated that they did not. Defense counsel then asked whether, at Marshall Jr.'s meeting with the case agent and the prosecutor, the government told him that he could be charged with perjury for lying under oath, and he indicated that they did. He also testified that they discussed potential penalties, including a fine and jail time. Marshall Jr. acknowledged the "cloud of a perjury charge" that followed these conversations and his desire to obtain "some mercy for what [he] did" by cooperating with the government.

On redirect, the government immediately sought to clarify who had first suggested that Marshall Jr.'s testimony at the November 15 hearing may have been untruthful. When Marshall Jr. responded, "The judge and you," the prosecutor was not satisfied; he asked Marshall Jr. if he remembered *what* the judge had said to him. Defense counsel promptly objected and requested a sidebar, but the judge rejected that request, stating, "No. If I said something, it will be in the record, and you have a copy of the record. Everybody's been talking about what everybody said. So if you have what I said, it's on the

record. It can be put before the jury." (Trial Tr. 221.) Then, after a second rejected request for a sidebar,[2] and over defense counsel's repeated objections, the prosecutor read aloud the entirety of the trial judges's suppression-hearing comments indicating his belief that Marshall Jr. was testifying untruthfully. Although we have already recounted those comments above and need not repeat them in full here, the last of those comments, as quoted by the prosecutor at trial, bears repeating:

> And, of course, now [the prosecutor] has asked him specific questions that lead me to the undeniable conclusion that he has not been credible *because he knew that his answers that he was giving were not the same answers that he had given to the grand jury in April.*

(Trial Tr. 223) (emphasis added).

Adding another wrinkle to this already unusual event, during the prosecutor's reading of the court's suppression-

---

[2] We have previously expressed our concern that a district court's refusal to entertain any sidebars, particularly where the trial judge's own comments or questions become the subject of a potential objection, may put defense counsel in an "awkward position." *See United States v. McCray*, 437 F.3d 639, 644 (7th Cir. 2006) (a case in which the same district judge presided). We reiterate that concern here; a full explanation of defense counsel's objection in the presence of the jury risked the same prejudice to the defendant as the prosecutor's recitation of the court's comments. Under these circumstances, a sidebar could have been particularly useful in "avoid[ing] the risk of unforeseen prejudice." *See id.*

hearing comments, the trial judge characterized his comments, in response to a defense counsel objection and in the presence of the jury, as "judicial testimony." The court stated, "It's my statement. You've got the record. Has he misread it? . . . It's a direct statement of the Court in a judicial proceeding. You were present. You have a copy of it. Has he misread what I said? . . . This is reading *judicial testimony.*"[3] (Trial Tr. 222-23) (emphasis added).

After the prosecutor finished reading the court's suppression-hearing comments, he asked whether Marshall Jr. recalled the judge making those comments at the November 15 hearing, and Marshall Jr. indicated that he did. And the prosecutor pressed further, asking:

Q. [W]as that the first person to raise any issue with you about whether or not you were telling the truth?

A. Yes.

Q. It wasn't me, was it?

A. No.

Q. It wasn't [the government's case agent], was it?

---

[3] Given Rule 605's prohibition on a trial judge offering testimony, this characterization should have immediately raised red flags. *See* Fed. R. Evid. 605 ("The judge presiding at the trial may not testify in that trial as a witness."). Although Blanchard failed to raise this specific objection at trial, he did not need to do so in order to preserve the issue for review. *See id.* ("No objection need be made in order to preserve this point.").

A.  No.

(Trial Tr. 224.)

During a break in the proceedings following the con-
clusion of Marshall Jr.'s testimony, and outside the pres-
ence of the jury, the trial judge sought to clarify his ratio-
nale for permitting the introduction of his suppression-
hearing commentary:

> The Court allowed [the prosecutor] to read the
> Court's statements into the record because there
> had been much testimony concerning the Novem-
> ber 15th testimony of Marshall Blanchard Jr. . . . .
> [Defense counsel] determined as a trial tactic to
> lead the jury to believe that somehow Mr.
> Blanchard Jr. after he had left court was either
> contacted or discussed with [the prosecutor] or
> [the case agent] for the first time concerning his
> testimony. That clearly opened the door for [the
> prosecutor] to read into the record the Court's
> comments from November 15th because that was
> clearly the first time Marshall Blanchard was
> confronted with what this Court believed . . . to be
> perjury. . . . I did not want to rule this way on
> the record in front of the jury as to why it was
> allowing [the prosecutor] to proceed because the
> inference of the Court's ruling could have been
> prejudicial to the defendant. So the Court merely
> wanted [the prosecutor] to read into the record
> accurately and clearly the Court's comments,
> which were no surprise to [defense counsel]. And
> while [defense counsel] protested loudly, causing

> the Court to have to make it clear, the only objection he could have was whether it was being read accurately. I'm doing this out of the presence of the jury now so as not to prejudice the defendant for the trial tactic that opened the door.

(Trial Tr. 255-56.)

Blanchard now contends that the prosecutor's use at trial of the court's suppression-hearing commentary—what the trial judge characterized as his "judicial testimony"—amounted to both judicial bias and prosecutorial misconduct. Blanchard argues that the introduction of the court's statements effectively constituted a judicial endorsement of the most damaging version of Marshall Jr.'s testimony and thereby deprived him of a fair trial. In addition, at trial, Blanchard objected on the grounds of relevance and unfair prejudice. And there is yet another evidentiary issue presented where so-called "judicial testimony" is put before the jury, as in this case. *See* Fed. R. Evid. 605. Before considering the broader fair-trial issues, we first take up the narrower, threshold evidentiary issues, which we review for an abuse of discretion. *See United States v. Samuels*, 521 F.3d 804, 813 (7th Cir. 2008).

Federal Rule of Evidence 605 prohibits a presiding district court judge from testifying at trial as a witness or engaging in equivalent conduct. *See United States v. Sliker*, 751 F.2d 477, 499 (2d Cir. 1984) (discussing the purpose of Rule 605 in light of the advisory committee's notes). Although a district court judge may facilitate the jury's understanding of the case by questioning witnesses and explaining, summarizing, and commenting on the evi-

dence, *United States v. Paiva*, 892 F.2d 148, 159 (1st Cir. 1989) (citing *Quercia v. United States*, 289 U.S. 466, 469-70 (1933)); *United States v. Nickl*, 427 F.3d 1286, 1293 (10th Cir. 2005), it is improper for the judge to add to the evidence by assuming the role of a witness, *Nickl*, 427 F.3d at 1293; *Paiva*, 892 F.2d at 159; *Sliker*, 751 F.2d at 499. Where a trial judge's comments are based upon his own personal knowledge of matters external to the trial, those comments may constitute impermissible judicial testimony. *See, e.g., United States v. Berber-Tonico*, 510 F.3d 1083, 1091 (9th Cir. 2007) (concluding that trial judge "violated Rule 605 when he interjected his own observations" on facts which were neither in the record nor reasonably derived therefrom, but did not violate Rule 605 where he merely summed up the evidence); *Nickl*, 427 F.3d at 1293-94 (noting that "presiding judge's commentary . . . added new evidence which the prosecution was otherwise unable to establish").

In this case, we conclude that the introduction of the trial judge's suppression-hearing comments amounted to impermissible judicial testimony. First, the judge's comments were based upon and incorporated his own personal observations of Marshall Jr. at the November 15 suppression hearing; indeed, the trial judge's comments indicated that his opinion of Marshall Jr.'s credibility was based largely upon shifts in Marshall Jr.'s "manner and demeanor" that day. Such comments violate Rule 605 by "add[ing] new evidence which the prosecution was otherwise unable to establish." *Nickl*, 427 F.3d at 1293-94; *see also Berber-Tonico*, 510 F.3d at 1091.

While it is true that the prosecutor, rather than the trial judge, read the judge's suppression-hearing comments into the record at trial, this in no way alters our conclusion. In the presence of the jury, the trial judge acknowledged that the suppression-hearing comments were his own, insisted that the only valid objection to the comments' introduction could be if they were not read "word for word," and characterized the comments as his "judicial testimony." Under such circumstances, Rule 605 is violated; the rule would serve little purpose if it were violated only where a judge observes all the formalities—taking of an oath, sitting in the witness chair, etc.—of an ordinary witness. *Cf. Nickl*, 427 F.3d at 1292-93 (finding that the trial judge violated Rule 605 when he interrupted the cross-examination of a witness and offered, in response to defense counsel's question, his own opinion on an ultimate factual issue).

Before turning to our harmless error analysis, we pause to consider Blanchard's additional argument that the danger of unfair prejudice from the "judicial testimony" significantly outweighed its probative value, compelling exclusion. *See* Fed. R. Evid. 403. We first note that the trial judge's suppression-hearing comments were of minimal relevance; the saga of Marshall Jr.'s shifting testimony was already before the jury, and the judge's credibility evaluation had little, if any, "tendency to make the existence of any [material fact] more probable or less probable than it would [have been] without the evidence." *See* Fed. R. Evid. 401. The government concedes as much by not arguing that this evidence had any independent relevance; instead, following the district court's rationale,

the government insists that defense counsel "opened the door" to this line of questioning. The government cites to *United States v. Peco*, 784 F.2d 798, 805 (7th Cir. 1986), for the proposition that "[w]hen a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." *Id.* (quoting *United States v. Carter*, 720 F.2d 941, 948 (7th Cir. 1983)). And the government asserts that defense counsel's cross-examination of Marshall Jr. opened the door to its attempt to show that it was the district court, rather than the government, who *first* challenged Marshall Jr.'s truthfulness at the November 15 hearing.

We disagree. Although the trial transcript reveals that defense counsel asked Marshall Jr. whether anyone from the government initiated contact with him following the November 15 hearing, he responded in the negative. Indeed, Marshall Jr. indicated that he contacted the government on his own, after discussing his concerns with his mother, in an effort to correct his testimony. And although Marshall Jr. then testified that, at his meeting with the government, they discussed potential perjury charges and corresponding penalties, this went to the issue of Marshall Jr.'s motivation for changing his testimony, not the issue of who *first* suggested that he had been untruthful at the November 15 hearing.

In addition, the government's "open the door" argument rests upon a flawed factual premise; in fact, it was the government, not the trial judge, who *first* challenged Marshall Jr.'s truthfulness when the prosecutor con-

fronted Marshall Jr. with his prior inconsistent grand jury testimony at the November 15 hearing. In so doing, the government repeatedly asked Marshall Jr. whether, in light of his earlier testimony, he wished to change any of his testimony that day. It was only *after* defense counsel objected to this line of questioning that the court offered its own opinion of Marshall Jr.'s truthfulness.

Moreover, even if defense counsel had somehow intimated on cross-examination that the government first challenged Marshall Jr.'s truthfulness, this would have come as no great surprise to the jury, because the government's direct examination of Marshall Jr. seemed to establish just that:

Q. [A]fter [defense counsel] finished asking you his questions [at the November 15 hearing], did I have an opportunity to ask you questions?

A. Yes.

Q. And did you know at the time that, whether or not the government had in its possession a full transcript of everything you said before the grand jury?

A. I was—I was pretty sure you did, but I wasn't sure entirely.

Q. And when I asked you questions that day, did I ask you, or point out and ask you to explain the difference between what you told the grand jury under oath six months earlier and what you told the judge under oath that day?

> A. Yes.
>
> Q. Did I ask you those questions?
>
> A. Yes.
>
> Q. Were you able to explain the difference?
>
> A. No.
>
> Q. How was that day for you?
>
> A. One of the worst days of my life.

(Trial Tr. 128-29.) The absence of a factual underpinning for the government's argument only strengthens our conclusion; there was no compelling justification for the introduction of the court's statements.

And a compelling justification was required, because not only was the trial judge's suppression-hearing commentary of dubious relevance, but the danger of unfair prejudice was unquestionably high. *See* Fed. R. Evid. 403 (relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). As explained further below, the introduction of this evidence risked placing the weight of the court's authority behind the government-friendly version of Marshall Jr.'s testimony; thus, there was a significant risk of unfair prejudice to the defendant. *Cf. United States v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999) ("Because trial judges wield substantial influence over juries . . . . [a] judge cannot assume the role of an advocate for either side . . . .").

Therefore, we conclude that the introduction of the trial judge's suppression-hearing comments was erroneous under Rules 605 and 403, and the only re-

maining question is whether this error was nonetheless harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Owens*, 424 F.3d 649, 656 (7th Cir. 2005)); *see also* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). At the outset, we note that it is difficult to imagine a scenario in which the court's pronouncements on the credibility of a key government witness could fail to influence the jury. Indeed, Rule 605 is intended to guard against the "prejudice which may arise . . . because of the judge's influential position with the jury." *Nickl*, 427 F.3d at 1293 (citing Fed. R. Evid. 605 advisory committee's note). And the magnitude of this influence is difficult to overstate; as the Supreme Court has explained, "The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." *Quercia*, 289 U.S. at 470 (internal quotation omitted); *see also United States v. Curry*, No. 07-2455, slip op. at 14 (7th Cir. Aug. 15, 2008) (noting that, because "trial judges wield substantial influence over juries," a judge "should take special care not to indicate his beliefs about a witness' honesty" (quotation omitted)); *Martin*, 189 F.3d at 553 (noting judge's "substantial influence" over jury and consequent need for the judge to avoid assuming the role of advocate); *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (noting that a trial judge's "position before a jury is overpowering").

The potentially "overpowering" influence of the trial judge on the jury takes on added significance because of the nature of Marshall Jr.'s shifting testimony in this case. His pretrial and trial testimony presented essentially two stories; first, at the grand jury hearing, he told the story favorable to the government. He then reversed course at the November 15 suppression hearing, contradicting portions of his grand jury testimony in a manner that strengthened his father's defense. He then reversed course once again, disavowing his November 15 testimony and essentially re-adopting the story he told before the grand jury, a story that he stuck to at trial. And naturally, defense counsel sought to show on cross-examination that Marshall Jr. had an incentive to change his November 15 testimony after discussing potential perjury charges with the government. Given this context, the introduction of the trial judge's earlier comments—expressing his unequivocal belief that Marshall Jr. was untruthful in departing from his grand jury testimony at the November 15 hearing—conveyed, at a minimum, judicial disapproval of the most defendant-friendly version of Marshall Jr.'s testimony. At worst, it effectively stamped the government-friendly version of Marshall Jr.'s testimony with the seal of judicial imprimatur. In this vein, the last statement from the court's suppression-hearing comments—indicating the court's belief that Marshall Jr. was not credible "because he knew that his answers that he was giving *were not the same answers that he had given to the grand jury* in April" (Trial Tr. 223) (emphasis added)—is particularly damning, because it seemingly endorses the government-friendly version of Marshall Jr.'s testimony.

Thus, in allowing his suppression-hearing comments to come in before the jury, the trial judge placed not just a thumb, but a very heavy fist, on the scales of justice, tipping the balance firmly in the government's favor. *Cf. United States v. Verser*, 916 F.2d 1268, 1272-73 (7th Cir. 1990) ("Fundamental to the right to a fair trial" is the court's obligation to avoid "giv[ing] the impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another." (quotation omitted)).

And Marshall Jr. was not just a key government witness, but, at least with respect to the firearms charge, the star; his testimony was crucial to establishing Blanchard's control over the porch firearms. Although the handgun seized from Blanchard's bedroom might provide an independent basis to sustain the firearms conviction for sufficiency-of-the-evidence purposes, *see United States v. Alanis*, 265 F.3d 576, 592 (7th Cir. 2001) (finding recovery of gun from defendant's bedroom constituted sufficient evidence of constructive possession), the government focused its efforts at trial on the porch firearms. Marshall Jr.'s testimony regarding his father's ownership, control of, and access to those firearms was the lynchpin of the government's case. And although Marshall Jr.'s testimony was somewhat less important with respect to the methamphetamine manufacturing charge, it was nonetheless significant. Without his testimony, the government's case would have rested even more heavily on Blanding, a witness whose credibility was somewhat compromised by the jury's knowledge that she was a past methamphetamine user who had entered into an immunity agreement with the government. Blanding's account of the manufacturing arrangement—that

Blanchard facilitated and participated in the manu-
facture of methamphetamine in exchange for a share of
the product—was bolstered by Marshall Jr.'s testimony
regarding his father's behavioral and physical changes;
those changes supported an inference of the sort of
regular methamphetamine use that might motivate one
to encourage and participate in manufacture at his own
residence. Thus, the prejudicial effect of the court's argu-
able endorsement of Marshall Jr.'s grand jury testimony
cannot be neatly confined to the felon-in-possession charge.

The government's emphasis on Marshall Jr.'s testimony
at trial confirms his importance to the government's
overall case. He was not only the first witness called by
the government at trial, but also a point of emphasis in
closing argument, where the prosecutor stated: "Finally
and most importantly, you have to consider the testi-
mony of the defendant's own son. . . . There can be no
more compelling evidence in this case than the testimony
of Marshall Jr., the agony that was vivid from his testi-
mony." (Trial Tr. 871, 873.) The prosecutor reminded
the jury that Marshall Jr. had testified unfavorably to his
father before the grand jury with respect to both the
drug manufacturing and felon-in-possession charges
before changing his testimony at the November 15 hear-
ing. Then, the prosecutor delivered a final reminder of the
trial judge's suppression-hearing comments: "On Novem-
ber 15th of last year, Marshall Jr. comes into this courtroom
before [the trial judge] and lies under oath for his dad. . . .
And it wasn't the government who suggested—who first
suggested that he wasn't telling the truth. *You heard what
happened during that hearing.*" (Trial Tr. 872) (emphasis
added). This comment provided one last, potentially

devastating reminder that the trial judge had effectively endorsed the grand-jury, government-friendly version of Marshall Jr.'s testimony.

And finally, the court did not instruct the jury in a manner sufficient to remedy the potential prejudice. First, the court failed to provide a timely limiting instruction (or any at all, for that matter) directing the jury to consider the court's suppression-hearing comments only for the purpose of establishing who first challenged Marshall Jr.'s truthfulness.[4] *See Nickl*, 427 F.3d at 1295 (finding Rule 605 violation was not harmless partly because "the judge offered no specific curative instruction which could have overcome his error"); *cf. Curry*, No. 07-2455, slip op. at 16-17 (where trial judge's explanation of the concept of hearsay might have been interpreted as impugning the credibility of the defendant, immediate and lengthy curative instruction helped to avoid reversible error, although it was noted to be a "close call"). Where the court's comments were introduced only

---

[4] The trial judge's failure to provide a timely limiting instruction is particularly puzzling in light of his decision to promptly "complete the record" at the next break in the proceedings. Outside the presence of the jury, he explained that he had permitted the introduction of his suppression-hearing comments solely for the limited purpose of establishing who first challenged Marshall Jr.'s truthfulness at the November 15 hearing. If the limited purpose of this evidence was of such importance that it required a detailed explanation in the record, then surely it was significant enough to merit a timely limiting instruction to the jury.

for this limited purpose, rather than the broader purpose of sharing the court's credibility evaluation of a crucial government witness, such an instruction may have been helpful in alleviating the potential prejudice. *Cf. United States v. Simpson*, 479 F.3d 492, 500 (7th Cir. 2007) (discussing failure to provide limiting instruction in analogous Rule 404(b) context). In the final jury instructions, the court did offer the following generic instructions:

> Nothing I say now and nothing I said or did during the trial is meant to indicate any opinion on my part about what the facts are or about what your verdict should be. The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and a stipulation.

*See* Seventh Circuit Pattern Criminal Jury Instructions 1.01, 1.02 (1999). In the unusual context presented here, we find these instructions insufficient to remedy the potential prejudice. First, although we ordinarily presume that jurors follow instructions, *see Ross*, 510 F.3d at 711, it is impossible to say—particularly in light of the trial judge's characterization of his comments as "judicial testimony"—whether a layperson juror would interpret these instructions as a command to disregard the so-called "judicial testimony" or an invitation to treat it as evidence. Second, even if the trial judge had not characterized his comments as "judicial testimony," it is doubtful that these generic instructions would have been sufficient, because they were "neither prompt, specific, nor emphatic." *Nickl*, 427 F.3d at 1295 (finding similar generic instruction insufficient to cure prejudice

caused by Rule 605 violation); *see also Quercia*, 289 U.S. at 472 ("Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury . . . . His definite and concrete assertion of fact, which he had made with all the persuasiveness of judicial utterance . . . was not withdrawn.").

In short, we conclude that the trial judge abused his discretion by allowing the introduction of his own suppression-hearing comments on the credibility of a key government witness, and this error was not harmless. In light of this conclusion, we need not reach the question of whether this error constituted judicial bias or prosecutorial misconduct. However, this case sounds a cautionary note for district court judges, who must remain alert to the potential impact of their comments on juries and the consequent need to avoid the appearance of partiality to either side. *See McCray*, 437 F.3d at 643; *United States v. Washington*, 417 F.3d 780, 784 (7th Cir. 2005).

## D.  Sufficiency of the Evidence

Before concluding, we briefly address Blanchard's sufficiency-of-the-evidence challenge to both convictions.[5] In challenging the sufficiency of the evidence,

---

[5] In light of our conclusion regarding the improper introduction of the court's suppression-hearing comments, this might

(continued...)

Blanchard faces a "daunting task." *United States v. Wortman*, 488 F.3d 752, 754 (7th Cir. 2007) (citation omitted). On review of such a challenge, we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the government, defer to the jury's credibility determinations, and overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Duran*, 407 F.3d 828, 839 (7th Cir. 2005) (quoting *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999)); *see also United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008). In other words, we will reverse "only if the fact finder's take on the evidence was wholly irrational." *United States v. Bustamante*, 493 F.3d 879, 884 (7th Cir. 2007) (internal quotation omitted).

Under this exceedingly deferential standard of review, we conclude that the district court did not err in denying Blanchard's Rule 29 sufficiency-of-the-evidence motion. Blanding's testimony, coupled with the methamphetamine-related evidence recovered from both Blanchard's residences, provided evidence in support of Count One. And Marshall Jr.'s testimony, coupled with the seizure of the firearms from Blanchard's Roberts residence, provided evidence of constructive possession of the porch fire-

---

[5] (...continued)
appear unnecessary. However, if Blanchard prevailed on this challenge, he would be entitled to a judgment of acquittal, and therefore, we find it appropriate to address his argument.

arms, in support of Count Two. *See United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003) (constructive possession exists where one has "the power and the intention at a given time to exercise dominion and control over an object, either directly or through others" (quotation omitted)); *Bustamante*, 493 F.3d at 889 (explaining that the government "can prove constructive possession of a gun by showing that police recovered the gun at the defendant's residence" (citing *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995)). In sum, this evidence provided a sufficient, rational basis for the case to go to the jury for deliberation; indeed, absent the strange and unusual events described in the foregoing section, Blanchard's convictions would be affirmed. However, that the jury's decision may have been rational does not mean that it was inevitable, and because we are troubled that the introduction of the trial judge's suppression-hearing commentary may have influenced the outcome of the trial, Blanchard's convictions cannot stand.[6]

---

[6] We briefly address two additional arguments that were included, almost as an afterthought, at the close of the Appellant's brief. Blanchard argues that his civil and possessory rights have been fully restored under Illinois law, precluding his conviction under 18 U.S.C. § 922(g)(1), but acknowledges that his argument is foreclosed by our decision in *Melvin v. United States*, 78 F.3d 327 (7th Cir. 1996). He also contends (without explanation or citation to authority) that § 922(g)(1) exceeds the scope of Congress's power under the Commerce Clause. But "movement in interstate commerce is all the Supreme Court

(continued...)

## III. Conclusion

For the foregoing reasons, we VACATE the Defendant's convictions and REMAND for a new trial. Circuit Rule 36 shall apply on remand.

---

[6] (...continued)

requires under the statute," *United States v. Jackson*, 479 F.3d 485, 492 (7th Cir. 2007) (citing *Scarborough v. United States*, 431 U.S. 563 (1977)), and Blanchard does not dispute the evidence of interstate movement of the firearms presented at trial. Blanchard indicates that he has raised these arguments in order to preserve them in the event of a change in the law, and we reciprocate his perfunctory development of these arguments with our rejection of them here.

---